UNITED STATES FIDELITY & GUARANTY COMPANY v MICHIGAN
CATASTROPHIC CLAIMS ASSOCIATION
(ON REHEARING)
HARTFORD INSURANCE COMPANY OF THE MIDWEST
v MICHIGAN CATASTROPHIC CLAIMS ASSOCIATION
(ON REHEARING)

Docket Nos. 133466 and 133468. Argued October 1, 2008 (Calendar No.
5). Decided July 21, 2009.

United States Fidelity & Guaranty Company (USF&G) and Hartford
Insurance Company of the Midwest (Hartford) filed separate
actions in the Oakland Circuit Court seeking declaratory judg-
ments that, under MCL 500.3104, the Michigan Catastrophic
Claims Association (MCCA) was required to reimburse them for
payments of personal protection insurance benefits above the
statutory threshold made to insureds who suffered catastrophic
injuries, regardless of whether the charges were reasonable. With
respect to USF&G, the court, Steven N. Andrews, J., agreed that
the MCCA was required to indemnify USF&G for the actual
amount it had paid regardless of whether the charges were
reasonable. The MCCA appealed. In the case of Hartford, the
court, Rudy J. Nichols, J., ruled that the MCCA could challenge
the reasonableness of the charges as a defense to a claim for indem-
nification, and Hartford appealed. After consolidating the cases,
the Court of Appeals, OWENS, P.J., and WHITE and HOEKSTRA, JJ.,
affirmed with respect to USF&G and reversed with respect to
Hartford, holding that MCL 500.3104 unambiguously requires the
MCCA to reimburse insurers for the full amount of personal
protection insurance benefits exceeding the statutory threshold
that the insurer was obligated to pay to its insured, regardless of
whether the amount was reasonable. 274 Mich App 184 (2007).
The Supreme Court granted leave to appeal. 481 Mich 862 (2008).
After hearing oral arguments, the Supreme Court held that, when
a member insurer's policy provides coverage only for reasonable
charges, the MCCA has the authority to refuse to indemnify
unreasonable charges and that, if the policy provides broader
coverage, the MCCA must review for compliance with the broader
coverage and indemnify claims within that coverage, but it may
reject claims in excess of that coverage. 482 Mich 414 (2008). The

plaintiffs filed motions for rehearing, which the Supreme Court granted. 483 Mich 918 (2009).

In an opinion by Justice Weaver, joined by Chief Justice Kelly and Justices Cavanagh and Hathaway, the Supreme Court *held*:

The indemnification obligation set forth in MCL 500.3104(2) does not incorporate the reasonableness standard that MCL 500.3107 requires between claimants and member insurers. The MCCA's powers are limited to furthering the MCCA's purposes, which do not include determining the reasonableness of claims. Accordingly, the MCCA has the power to adjust only the practices and procedures of its member insurers, not the payment amounts to which claimants and member insurers have agreed.

1. The interpretation of MCL 500.3104(2) requires a determination of how that provision relates to MCL 500.3107 and of how both provisions correspond within the larger statutory scheme. MCL 500.3104(2) requires that the MCCA provide, and each member accept, indemnification for 100 percent of the amount of ultimate loss sustained under personal protection insurance coverages in excess of a statutorily set amount. MCL 500.3107(1)(a), which defines "personal protection insurance benefits," requires that all personal protection insurance benefits claimed and paid between the insurer and the insured must be reasonable. Because the Legislature used the term "coverages" in § 3104 and the term "benefits" in § 3107, it can be inferred that the Legislature intended those terms to have different meanings. Therefore, the definition of "personal protection insurance benefits" in § 3107(1)(a) is not equivalent to the definition of "personal protection insurance coverages" in § 3104(2).

2. The Legislature limited the exceptions to "coverages" narrowly, which indicates that the term "coverages" is a broader term than "benefits." Because "coverages" is never given a more restrictive definition elsewhere in the statute, the word must be afforded its ordinary, everyday meaning. Dictionaries define "coverage" as the extent of protection afforded by an insurance policy, as protection against a risk or risks specified in an insurance policy, as the risks within the scope of an insurance policy, and as the amount and extent of risk covered by an insurer. The term "coverages" in MCL 500.3104 is positioned just after "ultimate loss," which is defined as the actual loss amounts that a member is obligated to pay and that are paid or payable by the member. The obligation of the insurer is to fulfill its duty by honoring its contractual coverages. The duty to perform the contract relates back to the ultimate loss insofar as the ultimate loss includes payment of the obligation, i.e., the total contracted amount.

Consequently, the MCCA must reimburse the insurers for 100 percent of the ultimate loss, which reflects the amount to which the insurer and the insured agreed, and subject to personal protection insurance coverage. The ultimate loss specifically refers to coverage, which is broader than benefits and is not statutorily limited to reasonable payments.

3. The relationship between the MCCA and its members is not subject to the reasonableness requirements of MCL 500.3107 because the MCCA is not a no-fault insurer of its member companies and the member companies are not injured persons entitled to no-fault indemnification. Instead, MCL 500.3104(2) requires the MCCA to indemnify, not to insure or to reinsure, the members for personal protection insurance payments that exceed the statutory threshold. The MCCA has the power under MCL 500.3104(7) to protect against unreasonable payments by assessing the adequacy of the procedures or practices of members that anticipate needing indemnification before a settlement has been reached.

4. MCL 500.3104(8)(g) grants the MCCA the limited power to further its purpose of prompt and efficient indemnification of its members. That power does not extend to declining to indemnify unreasonable amounts.

Affirmed.

Justice Young, joined by Justice Corrigan, dissenting, disagreed with the Court's decision to grant rehearing when only the composition of the Court, and not the facts, arguments, or legal rationale, had changed since the original opinion was issued. He stated that the decision to grant rehearing under these circumstances ignored precedent more than a century old. Consistent with the original opinion and based on the text of MCL 500.3104(2), he would hold that when a member insurer's policy only provides coverage for "reasonable charges," the MCCA has the authority to refuse to indemnify unreasonable charges. He dissented because the majority's decision was based on neither the controlling statute nor the majority's own definitions of "coverages." Moreover, its holding would have the effect of giving insurers an incentive to make unreasonable settlements and pass the enormous costs of those onto the Michigan citizens who must purchase no-fault automobile insurance. He also disagreed with the majority's statement that the MCCA is statutorily authorized to adjust a member's practices and procedures but not claims.

Justice Markman, dissenting, concurred fully with the discussion in part IV of Justice Young's dissenting opinion, which sets forth an analysis supporting the conclusion that, under the text of

MCL 500.3104(2), when a member insurer's policy only provides coverage for "reasonable charges," the MCCA has the authority to refuse to indemnify "unreasonable charges."

1. INSURANCE — NO-FAULT — PERSONAL PROTECTION INSURANCE BENEFITS — CATASTROPHIC CLAIMS — INDEMNIFICATION — UNREASONABLE CHARGES.

The Michigan Catastrophic Claims Association may not refuse to indemnify unreasonable charges for personal protection insurance benefits because the statutory provision setting forth its indemnification obligation does not contain a standard of reasonableness (MCL 500.3104[2]).

2. INSURANCE — NO-FAULT — PERSONAL PROTECTION INSURANCE BENEFITS — CATASTROPHIC CLAIMS — INDEMNIFICATION — POWERS OF THE MICHIGAN CATASTROPHIC CLAIMS ASSOCIATION.

The statutory powers of the MCCA to adjust the practices and procedures of member insurers do not encompass adjusting the payment amount to which a claimant and a member insurer have agreed (MCL 500.3104[7]).

3. INSURANCE — NO-FAULT — PERSONAL PROTECTION INSURANCE BENEFITS — CATASTROPHIC CLAIMS — INDEMNIFICATION — UNREASONABLE CHARGES — POWERS OF THE MICHIGAN CATASTROPHIC CLAIMS ASSOCIATION.

The limited statutory power of the MCCA to further its purpose of prompt and efficient indemnification of its members does not extend to declining to indemnify unreasonable charges (MCL 500.3104[8][g]).

*Plunkett Cooney* (by *Jeffrey C. Gerish* and *Gregory Gromek*) for United States Fidelity & Guaranty Company.

*Stark Reagan, P.C.* (by *Ava K. Ortner*), and *Dykema Gossett PLLC* (by *Joseph K. Erhardt, Jill M. Wheaton,* and *K. J. Miller*) for the Michigan Catastrophic Claims Association.

*Miller & Tischler, P.C.* (by *Milea M. Vislosky*), for Michael Migdal.

*Secrest Wardle* (by *Janet Callahan Barnes* and *John H. Cowley, Jr.*) for Hartford Insurance Company of the Midwest.

Amici Curiae:

*Speaker Law Firm, PLLC* (by *Liisa R. Speaker*), and *Sinas Dramis Brake Boughton & McIntyre PC* (by *George T. Sinas* and *Steven A. Hicks*) for the Coalition Protecting Auto No-Fault.

*Hackney, Grover, Hoover & Bean, PLC* (by *John P. Lewis*), for State Farm Mutual Automobile Insurance Company.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *William A. Chenoweth*, Assistant Attorney General, for the Commissioner of the Office of Financial and Insurance Regulation.

*John A. Lydick* for the Insurance Institute of Michigan.

ON REHEARING

WEAVER, J. This Court originally granted leave to appeal to consider whether MCL 500.3104(2) obligates the Michigan Catastrophic Claims Association (MCCA) to reimburse a member insurer for personal protection insurance (PIP) benefits paid to a claimant without regard to the reasonableness of the member insurer's payments of PIP benefits. This Court issued an opinion reversing the Court of Appeals and remanding for further proceedings, while holding that "when a member insurer's policy only provides coverage for 'reasonable charges,' the MCCA has authority to refuse to indemnify unreasonable charges."[1] Subsequently, plaintiffs United States Fidelity & Guaranty Company and Hartford Insurance Company of the Midwest filed mo-

---

[1] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 482 Mich 414, 417; 759 NW2d 154 (2008).

tions for rehearing. We granted plaintiffs' motions for rehearing, and these cases were resubmitted for decision without further briefing or oral argument.[2]

We now hold that the indemnification obligation set forth in MCL 500.3104(2) does not incorporate the reasonableness standard that MCL 500.3107 requires between claimants and member insurers. Furthermore, the powers granted to the MCCA in § 3104(7) are limited to adjusting the "practices and procedures" of the member insurers and do not encompass adjustment to the payment amount agreed to between claimants and member insurers. Moreover, we hold that the power granted to the MCCA under MCL 500.3104(8)(g) is limited to furthering the purposes of the MCCA and that determining reasonableness is not one of its purposes. Finally, although the MCCA has no right to directly challenge the reasonableness of a claim, the no-fault statute does provide the MCCA with safeguards against negligent actions of member insurers. Accordingly, we affirm the judgment of the Court of Appeals.

## I. FACTS AND PROCEDURAL HISTORY

### UNITED STATES FIDELITY & GUARANTY CO v MCCA

In the first case in these consolidated appeals, Daniel Migdal was injured in a 1981 car accident in which he sustained catastrophic injuries. His injuries included a traumatic brain injury with cerebral spastic quadriplegia, severe oral motor apraxia, and dysphasia. Because of the extent of the injuries, Daniel was prescribed, and received, 24-hour-a-day nursing care. In 1988, Michael Migdal (Mr. Migdal), Daniel's father and the conservator of Daniel's estate, sued the no-fault insurance

---

[2] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 483 Mich 918 (2009).

provider, United States Fidelity & Guaranty Company (USF&G), to recover expenses paid for Daniel's care. In 1990, the parties entered into a consent judgment. Pursuant to the judgment, USF&G paid Mr. Migdal $35,000 in exchange for a release from all contractual liability for nursing care provided before May 10, 1989. Additionally, USF&G agreed to pay $17.50 an hour for Daniel's home nursing care for the following year.[3] The payments would be made regardless of whether Daniel's parents provided the nursing care or a third party was brought in to provide the care. The hourly rate, fixed for the first year after the judgment, was subject to an annual increase of 8.5 percent. The increased rate would be compounded based on the previous year's rate.

Pursuant to the consent judgment, USF&G paid Mr. Migdal the consented-to hourly wage.[4] Once the amount paid to Mr. Migdal had reached the statutory threshold amount of $250,000,[5] the MCCA began to reimburse

---

[3] Mr. Migdal created a company to manage Daniel's care. This company acted as an intermediary that used the benefit payments from USF&G to pay the hired nurses who cared for Daniel and to pay Mr. Migdal for his efforts in Daniel's care. The judgment contained a provision stating that if Daniel's condition substantially changed, the court retained jurisdiction and could determine whether a reduction or increase in the payments was "warranted."

[4] Mr. Migdal testified that his duties included reading papers concerning business management and medical advances, checking and providing maintenance of Daniel's equipment, keeping the books, paying the nurses, and shopping for necessary items for Daniel's care.

[5] MCL 500.3104(2) reads, in pertinent part:

[T]he association shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of the following amounts in each loss occurrence . . . .

At the time of both accidents involved in these consolidated appeals, the threshold amount was $250,000.

USF&G for payments made to Mr. Migdal that exceeded the threshold. However, after the hourly rate had increased significantly with the passage of time, the MCCA eventually refused to reimburse USF&G for amounts that USF&G paid Mr. Migdal under the consent judgment, on the ground that the amounts were unreasonable. In 2003, USF&G filed a complaint in the Oakland Circuit Court for a declaratory judgment that the MCCA must reimburse USF&G for the total amount that USF&G paid to Mr. Migdal under the consent judgment, regardless of the reasonableness of the amount. At the time, USF&G was paying $54.84 an hour to Mr. Migdal for Daniel's nursing care.[6] The MCCA sought to only be required to reimburse USF&G at a rate of $22.05 an hour, arguing that the agreed-upon rate of $54.84 an hour was unreasonable and, therefore, the MCCA should not have to reimburse USF&G for the total amount. Meanwhile, USF&G sought to have the consent judgment with Mr. Migdal revised, arguing that circumstances had changed when Mr. Migdal hired a third party to care for Daniel instead of providing the nursing care himself. Mr. Migdal filed a motion for summary disposition for failure to state a claim upon which relief could be granted. The court granted Mr. Migdal's motion.[7]

Likewise, the MCCA moved for summary disposition. It contended that there was no question of material fact that the payments made by USF&G to Mr. Migdal were unreasonable. Moreover, the MCCA argued that the no-fault act only required reimbursement of payments

---

[6] Mr. Migdal paid $32 an hour of this amount to the nurses (including benefits) and kept the rest as compensation for his work.

[7] USF&G did not appeal that decision. We therefore express no opinion on whether the consent judgment would have been subject to judicial modification on the ground that the payment amount it called for had become unreasonable with the passage of time.

that are reasonable. In a countermotion for summary disposition, USF&G argued that the no-fault act required the MCCA to reimburse it for the full amount paid to Mr. Migdal, despite any unreasonableness regarding the amount paid. Alternatively, USF&G argued that there was a question of material fact concerning the "unreasonableness" of the consent judgment.

The trial court granted USF&G's motion for summary disposition, ruling that the MCCA must reimburse USF&G for its "ultimate loss,"[8] including the entire amount that USF&G had to pay Mr. Migdal, regardless of whether the amount paid was reasonable. The trial court denied the MCCA's motion for summary disposition. The trial court entered a judgment requiring the MCCA to reimburse USF&G in the amount of $1,725,072 under the no-fault act and holding the MCCA liable for future payments consistent with the consent judgment. The parties agreed to stay the enforcement of the order while the MCCA appealed by right in the Court of Appeals.

### HARTFORD INS CO v MCCA

In the second case of these consolidated appeals, Robert Allen was injured in a 2001 car accident in which he sustained catastrophic injuries. His injuries included right-sided pleuritic effusion, brain injuries, quadriparesis, bilateral frozen shoulder, and cardiopathy. Because of the extent of the injuries, Allen was prescribed, and received, 24-hour-a-day care by a licensed nurse. Hartford Insurance Company of the Midwest (Hartford), Allen's no-fault insurer, initially paid $20 an hour for the nurse. In 2003, Hartford agreed to pay an increased rate of $30 an hour for Allen's care.

---

[8] MCL 500.3104(2).

Soon thereafter, Hartford's payments for Allen's care exceeded the $250,000 statutory threshold.

The MCCA refused to reimburse Hartford for any payments above $20 an hour for the services rendered. Hartford filed a complaint for a declaratory judgment that would require the MCCA to pay Hartford $571,847.21 as reimbursement for payments exceeding the no-fault threshold. Additionally, Hartford sought a declaration that the MCCA must reimburse Hartford for the total payments above the $250,000 threshold, regardless of the reasonableness of the payments. After the initial filing, Hartford moved for summary disposition, arguing that the no-fault act required the MCCA to reimburse Hartford for the entire amount paid to Allen that exceeded the threshold, regardless of the reasonableness of that amount. The MCCA argued that it only had to reimburse Hartford for reasonable payments and that there was insufficient discovery concerning the reasonableness of the amount of the payments. The circuit court ruled that reasonableness was an element in determining how much the MCCA must reimburse Hartford and that there was insufficient discovery to determine if the payments were reasonable. Hartford immediately appealed the trial court's holding requiring the element of reasonableness to be considered.

### THE COURT OF APPEALS' DECISION

The Court of Appeals consolidated the USF&G and Hartford cases and held that "MCL 500.3104 does not incorporate a 'reasonableness' requirement and requires the MCCA to reimburse insurers for the *actual* amount of PIP benefits paid in excess of the statutory

threshold."[9] (Emphasis in the original.) The MCCA sought leave to appeal in this Court, and this Court granted leave.[10] This Court issued an opinion reversing the Court of Appeals and remanding for further proceedings, while holding that "when a member insurer's policy only provides coverage for 'reasonable charges,' the MCCA has authority to refuse to indemnify unreasonable charges."[11] Subsequently, plaintiffs United States Fidelity & Guaranty Company and Hartford Insurance Company of the Midwest filed motions for rehearing. We granted plaintiffs' motions for rehearing and this case was resubmitted for decision without further briefing or oral argument. 483 Mich 918 (2009).[12]

---

[9] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 274 Mich App 184, 192; 731 NW2d 481 (2007).

[10] 481 Mich 862 (2008).

[11] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 482 Mich 414, 417; 759 NW2d 154 (2008).

[12] Justices CORRIGAN and YOUNG were simply shown as denying the motions for rehearing. However, Justice YOUNG, in his dissent joined by Justice CORRIGAN, now takes the opportunity well after the motions for rehearing have been decided to attack the remaining justices who did not vote to retain this Court's earlier decision.

The dissent erroneously asserts that the justices voting to grant rehearing erred because *Peoples v Evening News Ass'n*, 51 Mich 11, 21; 16 NW 185 (1883), held that this Court is precluded from granting rehearing when the composition of the Court has changed, absent any new arguments from the parties in the cases. However, contrary to the dissent's assertions, this Court merely stated in *Peoples* that a change in the composition of this Court cannot be the *basis* for granting rehearing.

Accordingly, if the composition of the Court changes, and the composition becomes such that a majority of the Court sees a reason to grant rehearing, the majority is not precluded under *Peoples* from granting rehearing. If, for instance, four justices on the newly composed Court concluded that the challenged opinion was erroneous, those justices can vote to grant rehearing. The same holds true whether the deciding vote is a new justice who joined the Court after the challenged opinion was

## II. STANDARD OF REVIEW

Statutory interpretation is a question of law, which this Court reviews de novo. *In re Investigation of March 1999 Riots in East Lansing (People v Pastor)*, 463 Mich 378, 383; 617 NW2d 310 (2000). This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Herald Co v Bay City*, 463 Mich 111, 117; 614 NW2d 873 (2000).

## III. ANALYSIS

The issue before this Court involves how much of a member insurer's coverages the MCCA must indemnify in the event of a catastrophic injury. Specifically, is the MCCA liable for reimbursement of PIP payments based on potentially unreasonable claims?

The outcome of these cases depends on this Court's interpretation of the language in MCL 500.3104. An overarching rule of statutory construction is "that this Court must enforce clear and unambiguous statutory provisions as written." *In re Certified Question (Preferred Risk Mut Ins Co v Michigan Catastrophic Claims Ass'n)*, 433 Mich 710, 721; 449 NW2d 660 (1989)

---

released or whether the deciding vote comes from a justice who signed the challenged opinion and changed his or her mind after further consideration.

This practice is consistent with MCR 2.119(F)(3), which creates a "palpable error" standard for rehearing cases. It is up to the moving party to show palpable error that would lead to a different disposition in the case. If a majority of the Court is convinced by the moving party, the Court has the discretion to grant rehearing. Furthermore, while MCR 2.119(F)(3) states that a motion for rehearing will generally not be granted if the motion only presents the same arguments decided in the original disposition of the case, MCR 2.119(F)(3) explicitly refrains from "restricting the discretion of the court" to grant rehearing.

Accordingly, we are not persuaded by the dissent's attempts to discredit this Court's order that granted rehearing in this case.

(quotation marks omitted). "If the language of [a] statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written." *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999). However, "what is 'plain and unambiguous' often depends on one's frame of reference." *Shiffer v Gibraltar School Dist Bd of Ed*, 393 Mich 190, 194; 224 NW2d 255 (1974). In order to ascertain this frame of reference, the contested provisions must be read in relation to the statute as a whole and work in mutual agreement. *In re Certified Question*, 433 Mich at 722. See also *State Treasurer v Wilson*, 423 Mich 138, 144; 377 NW2d 703 (1985).

Additionally, the frame of reference shares a deep nexus with the intent of the Legislature. "The primary goal of statutory interpretation is to give effect to the intent of the Legislature." *Title Office, Inc v Van Buren Co Treasurer*, 469 Mich 516, 519; 676 NW2d 207 (2004), quoting *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999). Fundamentally, "[t]his task begins by examining the language of the statute itself. The words of a statute provide the most reliable evidence of [the Legislature's] intent . . . ." *Sun Valley*, 460 Mich at 236 (citation and quotation marks omitted). This Court must "consider both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.' " *Id.* at 237, quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995). "As far as possible, effect should be given to every phrase, clause, and word in the statute. The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended." *Sun Valley*, 460 Mich at 237.

In interpreting § 3104, this Court first must determine how § 3104(2) corresponds with § 3107 and how these two provisions correspond within the entire statutory scheme. Section 3104(2) requires that the MCCA "shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of the following amounts in each loss occurrence . . . . "[13] Section 3107(1)(a) defines "personal protection insurance *benefits*" as "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation." This provision requires that all PIP benefits claimed and paid between the insurer and the insured must be reasonable. The MCCA argues that this Court should incorporate the § 3107 definition of "benefits" into § 3104(2) where § 3104(2) refers to "coverages." However, we decline to do so because the phrase "personal protection insurance *benefits*" has a distinct meaning from the phrase "personal protection insurance *coverages*" that is found in § 3104(2).

When the Legislature uses different words, the words are generally intended to connote different meanings. Simply put, "the use of different terms within similar statutes generally implies that different meanings were intended." 2A Singer & Singer, Sutherland Statutory Construction (7th ed), § 46:6, p 252. If the Legislature had intended the same meaning in both statutory provisions, it would have used the same word. Therefore, we disagree with the MCCA and hold that the definition of personal protection insurance *benefits*

_____

[13] The amounts are statutorily set to increase over time. At the time of both accidents, the threshold amount was $250,000. In 2008, the threshold amount was $440,000. See MCL 500.3104(2)(a) to (k).

found in § 3107(1)(a) (including the reasonableness standard) is not equivalent to the definition of personal protection insurance *coverages* in § 3104(2).

The distinctive use of the term "coverages" is important. *LeBlanc v State Farm Mut Auto Ins Co*, 410 Mich 173, 204; 301 NW2d 775 (1981) (" 'Coverage', a word of precise meaning in the insurance industry, refers to protection afforded by an insurance policy, or the sum of the risks assumed by a policy of insurance."). Although the terms "benefits" and "coverages" are related because of their close proximity in the statute,[14] the proximity of these two terms does not mean that they are synonymous.

Section 3107 excludes from the definition of "allowable expenses" within PIP "coverage" hospital charges in excess of reasonable and customary semi-private room charges and funeral and burial expenses in amounts specified in the policy (subject to a range specified in that section). This leaves all other charges open to PIP "coverage." The fact that the Legislature limited the exceptions to "coverage" so narrowly indicates that the term "coverage" is a broader term than "benefits." Moreover, because "coverages" is never given a more restrictive definition elsewhere in the

---

[14] MCL 500.3107(1) provides, in pertinent part:

> Except as provided in subsection (2), personal protection insurance *benefits* are payable for the following:

> (a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation. Allowable expenses within personal protection insurance *coverage* shall not include charges for a hospital room in excess of a reasonable and customary charge for semiprivate accommodations . . . or for funeral and burial expenses in the amount set forth in the policy which shall not be less than $1,750.00 or more than $5,000.00. [Emphasis added.]

statutes, the word must be afforded its ordinary, every-day meaning. *Sun Valley*, 460 Mich at 237 ("The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended."). In the grammatical context, the meaning of "coverages" is its common meaning, limited only by the specific statutory exceptions.

"Coverage" is defined in dictionaries as the "[e]xtent of protection afforded by an insurance policy [or the] amount of funds reserved to meet liabilities,"[15] as "protection against a risk or risks specified in an insurance policy,"[16] as "the risks within the scope of an insurance policy,"[17] and as the "amount, and extent of risk covered by insurer."[18] Under the common meaning of "coverage," the contractual liability amount that an insurer agrees to pay an insured is considered a part of the insurer's coverage. USF&G and Hartford paid funds pursuant to a consent judgment and a settlement agreement with the respective insureds. This contractual liability, or coverage, owed by each insurer is the total amount agreed to between the original contracting parties. The reasonableness of the agreed payment amount is not a factor.

The meaning of "coverages" in MCL 500.3104 becomes clearer after considering " 'its placement and purpose in the statutory scheme.' " *Sun Valley*, 460 Mich at 236, quoting *Bailey*, 516 US at 145. In the statute, "coverages" is positioned just after "ultimate loss." "Ultimate loss" is statutorily defined as the "actual loss amounts that a member is *obligated* to pay and that are paid or payable by the member . . . ." MCL

---

[15] *Webster's II New College Dictionary* (1995).

[16] *Random House Webster's College Dictionary* (2001).

[17] Black's Law Dictionary (7th ed).

[18] Black's Law Dictionary (5th ed).

500.3104(25)(c) (emphasis added). The obligation of the insurer is to fulfill its duty by honoring its contractual coverages. The duty to perform the contract relates back to the ultimate loss insofar as the ultimate loss includes payment of the obligation, i.e., the total contracted amount. Consequently, the MCCA must reimburse the insurers for 100 percent of the ultimate loss, which reflects the amount to which the insurer and the insured agreed, and subject to PIP coverage. The ultimate loss specifically refers to coverage, which is broader than benefits and is not statutorily limited to reasonable payments.[19]

Moreover, the MCCA is not a no-fault insurer of its member companies, and the member companies are not injured persons entitled to no-fault indemnification. Thus, the relationship between the MCCA and its members is not subject to the reasonableness requirements found in MCL 500.3107. Rather, the Legislature provided in § 3104(2) that the MCCA would "indemnify" the insuring members for PIP payments. The Legislature did not state that the MCCA would "insure" or "reinsure" the members for amounts greater than the threshold. Black's Law Dictionary (5th ed) defines "indemnify" as "[t]o restore the victim of a loss, in whole or in part, by payment . . . ; to secure against loss or damage . . . ." Indemnification is not a contingent plan like an insurance plan. Instead, it is a set security

---

[19] The MCCA argues that if there is not a reasonableness factor for it to enforce, the member insurers will have no incentive to make reasonable settlements that do not exceed the statutory threshold amount because the insurers will not be liable to pay anything beyond the threshold amount. However, one incentive comes from higher premiums paid to the MCCA. See MCL 500.3104(7)(d) (requiring that the MCCA assess its member companies an annual premium on each of their no-fault policies written in Michigan). If all the individual members act in a manner that does not regard the reasonableness of their settlements, then insurance premiums will increase greatly.

meant to assist against certain circumstances. Here, those circumstances arise when the PIP amount contracted by the insurer exceeds the statutory threshold.

Section 3401(1) states that the MCCA is "not subject to any laws . . . with respect to insurers." Thus, the MCCA is not a no-fault insurer, and consequently it is also not a reinsurer. Because the MCCA is not a no-fault insurer, but, rather, an indemnitor of no-fault insurers for benefits in excess of the statutory threshold, § 3107 does not directly bind the MCCA; it only binds the insurer members and the insured. Section 3107 "makes both reasonableness and necessity explicit and necessary elements of a *claimant's* [insured's] recovery . . . ." *Nasser v Auto Club Ins Ass'n*, 435 Mich 33, 49; 457 NW2d 637 (1990) (emphasis added). Specifically, it is the insurance company that has the right to deny a claim (or part of a claim) for unreasonableness under § 3107. The *insured* then has the burden to prove that the charges are in fact reasonable. See, generally, *Nasser*, 435 Mich at 49, *Manley v Detroit Automobile Inter-Ins Exch*, 425 Mich 140; 388 NW2d 216 (1986), and *LaMothe v Auto Club Ins Ass'n*, 214 Mich App 577; 543 NW2d 42 (1995). Given that the established burden of proof is on the insured, it is counterintuitive to conclude that the member insurance company would benefit from not having the burden of proof in one instance against an insured, but having the burden in another instance against the MCCA.

The MCCA maintains that the foregoing statutory constructions will lead to higher costs to insureds and will be a disincentive for member insurers to keep payments reasonable. These fears are unfounded. The MCCA is an unincorporated nonprofit association, whose purpose is to provide insurers with indemnification for PIP policies that exceed a certain threshold. See

MCL 500.3104(1). The Legislature created the MCCA "in response to concerns that Michigan's no-fault law provision for unlimited [PIP] benefits placed too great a burden on insurers, particularly small insurers, in the event of 'catastrophic' injury claims." *In re Certified Question*, 433 Mich at 714. The MCCA maintains that it should have the ability to unilaterally stop making indemnification payments to a member when it determines that the claim payments are unreasonable. Yet, the MCCA acknowledges that a member can take the MCCA to court over a reasonableness dispute, which would leave a finder of fact as the ultimate authority over whether the payments are reasonable.

In essence, under the MCCA's preferred outcome, when a member insurer makes an agreement with an insured (often in a litigation setting, whether it be an arbitration hearing, consent judgment, or declaratory judgment), the member must then sue the MCCA if the MCCA finds that the payment is unreasonable. If this Court were to accept the MCCA's argument, the logical consequence would be that member insurers would be reluctant to settle with the claimant. Member insurers might then force a jury trial with every catastrophically injured claimant in order to secure a verdict with a "reasonable" stamp on the result. This outcome goes against the legislative purpose of ensuring efficient and quick recovery for claimants in the no-fault system. *Shavers v Attorney General*, 402 Mich 554, 578-579; 267 NW2d 72 (1978) ("The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses.").

In response to the MCCA's concerns, it should be pointed out that the MCCA is not without a safeguard to protect against unreasonable payments. The Legis-

lature specifically laid out powers that the MCCA can exercise to guard against unreasonable settlements of catastrophic claims. MCL 500.3104(7)(b) states that the MCCA shall

> [e]stablish procedures by which members shall promptly report to the association each claim that, on the basis of the injuries or damages sustained, may reasonably be anticipated to involve the association if the member is ultimately held legally liable for the injuries or damages. Solely for the purpose of reporting claims, *the member shall in all instances consider itself legally liable for the injuries or damages*. The member shall also advise the association of subsequent developments likely to materially affect the interest of the association in the claim. [Emphasis added.][20]

This statutory language requires and empowers the MCCA to establish procedures to protect itself from unreasonable settlements in all cases involving claims that may exceed the threshold and consequently affect the MCCA. The MCCA's plan of operation likewise echoes these statutory requirements.[21] This language enables the MCCA to establish procedures that will enable it to exercise appropriate control over settlements whenever the member reasonably anticipates that the claim will involve the MCCA.

Only then, not after the claimant and member insurer have reached a settlement, can the MCCA exer-

---

[20] Section 3104 includes numerous other rules for the MCCA, such as membership requirements, liability, and creation of a "plan of operation."

[21] Art X, § 10.01 of the plan of operation provides in part:

> Members shall report to the Association such information as the Board may require on forms prescribed by the Board: (a) As soon as practicable after the loss occurrence, Members shall report each claim which, on the basis of the injuries or damages sustained, may reasonably be anticipated to result in a Reimbursable Ultimate Loss, and for purposes of reporting the Member shall consider itself legally liable for the injuries and damages.

cise control over the settlement process. Under MCL 500.3104(7)(g), the MCCA must

> [e]stablish procedures for reviewing claims procedures and practices of members of the association. *If the claims procedures or practices of a member are considered inadequate to properly service the liabilities of the association, the association may undertake* or may contract with another person, including another member, *to adjust or assist in the adjustment of claims* for the member on claims that create a potential liability to the association and may charge the cost of the adjustment to the member. [Emphasis added.]

Thus, when § 3104(7)(g) is read in conjunction with § 3104(7)(b), the outcome is that the MCCA is required to review those reports by members that anticipate needing indemnification and to assess the adequacy of the *procedures or practices* of the member.[22] Upon a finding of inadequacy, the MCCA can adjust the *practices or procedures* of the member.[23] One of the key protections here is that the MCCA has the power and

---

[22] The MCCA argued that because part of § 3104(7)(g) uses the term "may" instead of "must" in describing some of its potential powers, the MCCA has greater power than what directly follows in the statute to limit or control the individual member insurers. The MCCA wishes to conclude that since the section does not set forth a duty to act in a specific way (e.g., review claims), it allows the MCCA to act how *it* wants regarding member claims, including questioning their reasonableness. This is erroneous. The premise and purpose of the MCCA is to indemnify insurers for payments beyond the threshold amount, so that insurance firms of all sizes can compete in Michigan's no-fault market without fear of sustaining disproportionate catastrophic loss claims.

[23] The plan of operation also echoes the statute in this regard:

> If a Member or 3103 Member refuses to timely submit the reports or information required of it pursuant to Section 10.01 or otherwise, or if the Board should determine that the reports and information submitted by a Member or 3103 Member are unreliable or incomplete, the Board may, at the member's expense, direct that an authorized representative of the Association (which may

duty to adjust *only* "procedures and practices" of the member that produce an unreasonable payment amount; the power does not include the power to adjust the amount after a settlement has been reached.[24] The MCCA has the power to step in before a settlement has been reached and adjust situations that it anticipates might otherwise expose it to unreasonable indemnification costs. By requiring submission of proposed settlement agreements for approval, the MCCA can protect itself against later having to pay unreasonable claims from member insurers. The exercise of these powers is the MCCA's protection against a member's neglect of its duties.

Finally, the MCCA argues that § 3104(8)(g) gives it the power to question reasonableness regardless of the statute's other provisions. Specifically, § 3104(8)(g) allows the MCCA to "[p]erform other acts not specifically enumerated in this section that are necessary or proper to accomplish the purposes of the association and that

be another member) shall audit and inspect such member's records and compile the required information and data. [Art X, § 10.02.]

[24] Although § 3104(7)(g) states that the MCCA may "adjust or assist in the adjustment of claims," the practical effect of § 3104(7)(g) is that only the MCCA is able to prescribe procedures and practices by which to ensure the reasonableness of the amounts that members agree to pay to claimants. When the MCCA asserts its power to adjust or assist in the adjustment of a claim, the MCCA effectively steps into the shoes of the member insurer. The claim that the MCCA reviews for adjustment purposes is the insured's claim with the member insurer, not the member insurer's reimbursement claim with the MCCA. Accordingly, the MCCA, standing in the shoes of the member insurer, is limited to the member insurer's power to review the insured's claim for reasonableness as spelled out in the member insurer's policy, a settlement agreement, or a consent judgment. Thus, even when the MCCA assists in or assumes control over the claims adjustment process, the amount payable is still dictated by the amount that the member insurer is "obligated" to pay to the insured when a settlement already has been reached.

are not inconsistent with this section or the plan of operation." However, this section does not give the MCCA carte blanche to simply avoid a member insurer's agreement that it finds unreasonable. The power granted under § 3104(8)(g) is limited to accomplishing the "purposes of the association." More importantly, the exercise of this power cannot be "inconsistent with this section or the plan of operation." *Id.* The plan of operation created pursuant to § 3104(17) must be "*consistent* with the objectives and provisions of this section, which shall provide for the economical, fair, and non-discriminatory administration of the association *and for the prompt and efficient provision of indemnity.*" MCL 500.3104(17) (emphasis added).

Section 3104(8)(g) allows the MCCA to fulfill the specific requirements of the statute. Accordingly, we interpret § 3104(8)(g) as granting the MCCA the limited power to further its purpose of prompt and efficient indemnification of its members. To interpret that section as granting any further power, such as the power to decline indemnification on the basis of the reasonableness of the indemnification amount, would be inconsistent with the Legislature's intent.

### IV. RESPONSE TO THE DISSENT

The dissent raises the concern that a decision in favor of plaintiffs in this case will result in substantially increased insurance costs. Certainly, insurance costs are a critical concern, but they are a policy concern that belongs to the Legislature. Nonetheless, we observe that the concern appears highly speculative and, indeed, unfounded. There is no evidence that insurers have engaged or will engage in slack negotiations. It bears mentioning here that there is no indication that the settlements in these cases were unreasonable when made.

The dissent bases its concern on an affidavit from defendant's executive director in which she refers to an estimate provided by consultants to defendant. No basis is given in the affidavit for the estimated increase in costs. And there is reason to wonder about this estimate, at least inasmuch as it might be based on an anticipated decision from this Court.

First, there is no evidence that defendant has routinely or even occasionally challenged the reasonableness of insurers' settlements with their insureds until very recently. It is difficult to understand how it will cost defendant extravagant sums to give up a practice it has only recently begun. Second, it is unknown whether the actuarial assessment factored in the effect of defendant's potential use of the cost-containment procedure actually provided by the Legislature in MCL 500.3104(7)(g).

As mentioned, the Legislature has provided that "[i]f the claims procedures or practices of a member are considered inadequate to properly service the liabilities of the association, the association may undertake . . . to adjust or assist in the adjustment of claims for the member on claims that create a potential liability to the association . . . ." MCL 500.3104(7)(g). There is no evidence that the actuarial assessment considered the effect of defendant's implementation of this legislatively provided cost-savings mechanism.

The dissent additionally fails to recognize that there is a compelling policy reason to reject defendant's claim that it may review settlements for reasonableness: namely, to limit litigation and promote settlements. This Court has long recognized that "[t]he goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain eco-

nomic losses." *Nelson v Transamerica Ins Services*, 441 Mich 508, 514; 495 NW2d 370 (1992) (citation and quotation marks omitted). Additionally, this Court has stated that "[t]he act is designed to minimize administrative delays and factual disputes that would interfere with achievement of the goal of expeditious compensation of damages suffered in motor vehicle accidents." *Miller v State Farm Mut Auto Ins Co*, 410 Mich 538, 568; 302 NW2d 537 (1981). The ability of insurers to settle claims is essential to meeting these goals. Yet, if defendant can reexamine settlements of reasonableness long after they are made, then insurers will be very reluctant to make settlements. Further, a new layer of litigation for after-the-fact reasonableness assessments, such as this one, would be inevitable. There is no evidence that the actuarial assessment on which the dissent relies has accounted for the substantial increase in litigation costs that would result if this Court allows defendant the extrastatutory power to question settlements for reasonableness after they are made.

But, again, these are policy concerns best addressed by the Legislature. It appears that the Legislature has indeed balanced these concerns in the provisions of MCL 500.3104, and there is no reason for this Court to apply a strained construction to the statutes to achieve a goal contrary to the purposes of the no-fault act. In the unlikely event that insurers become milquetoast negotiators, defendant has the statutorily provided protection to remedy the situation.

## V. CONCLUSION

We hold that the indemnification obligation set forth in § 3104(2) does not incorporate the reasonableness standard that § 3107 requires between claimants and member insurers. Furthermore, the powers granted to

the MCCA in § 3104(7) are limited to adjusting the "practices and procedures" of the member insurers and do not encompass adjustment to the payment amount agreed to between claimants and member insurers. Finally, we hold that the power granted to the MCCA under § 3104(8)(g) is limited to furthering the purposes of the MCCA, and that determining reasonableness is not one of its purposes.

Accordingly, we affirm the Court of Appeals holding that the MCCA must reimburse its member insurers 100 percent of the ultimate loss exceeding the statutory threshold for claims without a reduction based on its unilateral assessment of the reasonableness of the amount.

Affirmed.

KELLY, C.J., and CAVANAGH and HATHAWAY, JJ., concurred with WEAVER, J.

YOUNG, J. (*dissenting*). I respectfully dissent.

On December 29, 2008, this Court decided these cases.[1] Today, just a few months later, a new majority[2] reverses that decision and it does so without even affording the parties an opportunity to brief and argue why this reversal is warranted. Although not relevant to my analysis of the substantive issue in these cases,[3] the costs that the majority's decision will impose on Michigan drivers is relevant to assessing the majority's hurried approach and policy-based reversal of this

[1] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 482 Mich 414; 759 NW2d 154 (2008) (hereinafter *USF&G I*).

[2] I note that the majority in this case is the new philosophically aligned majority: Justices WEAVER, CAVANAGH, and HATHAWAY and Chief Justice KELLY.

[3] See *USF&G I*, *supra* at 432 n 32.

Court's prior decision. As I will discuss later, the majority's decision will cause every Michigan resident who owns and insures an automobile to pay a 19 percent higher annual surcharge premium for mandatory catastrophic coverage. The cost of the majority's decision to those with insured automobiles will be an estimated $693.8 million more for the coming year alone.[4]

## I. WHAT CHANGED?

The facts have not changed. The text of the statute at issue has not changed. The parties' arguments have not changed. And the rationale advanced in the opinions of this Court has not changed. Yet, within a matter of months, a decision of this Court, thoughtfully briefed, argued, and considered by seven justices, is no longer worth the paper it was written on. Even the casual observer, however, does not really need to ask why. The reason is obvious: On January 1, 2009, the composition of this Court changed.

## II. WHY IS THIS CASE BEING REHEARD?

This case was argued on October 1, 2008. On November 4, 2008, Justice HATHAWAY defeated then-Chief Justice TAYLOR in the election for his seat on this Court. This case was decided on December 29, 2008, with former Chief Justice TAYLOR casting his vote with the majority.

---

[4] In response to the motions for rehearing, the Michigan Catastrophic Claims Association (MCCA) has conducted an actuarial assessment to detail the expected increase in auto insurance premiums that reversal of our original decision will produce—19 percent more in catastrophic claims premiums to be precise. See the affidavit of Gloria Freeland in support of appellant's supplement to its answer to appellee's motion for rehearing, attached hereto as an appendix.

The new majority's opinion today offers no new rationale or argument. In fact, it is merely an extended quotation of Justice WEAVER's former dissent.

For over a century this Court has adhered to the principle that a motion for rehearing should be denied *unless* a party has raised an issue of fact or law that was not previously considered but which may affect the outcome.[5] Indeed, this Court codified that principle in our court rules.[6]

As Justice WEAVER's former dissent in these cases and the majority's new opinion make obvious, the parties have not raised a new issue of fact or law to merit rehearing. The only difference is in the membership of this Court. As early as 1883, this Court had the wisdom to realize that such a change is not a proper ground for rehearing. In *Peoples v Evening News Ass'n*,[7] this Court's opinion on a motion for rehearing stated in its entirety:

---

[5] See *Nichols, Shepard & Co v Marsh*, 62 Mich 439, 440; 29 NW 37 (1886); *Thompson v Jarvis*, 40 Mich 526, 526 (1879).

[6] See MCR 2.119(F)(3), which provides:

> Generally, and without restricting the discretion of the court, a motion for rehearing or reconsideration which merely presents the same issues ruled on by the court, either expressly or by reasonable implication, will not be granted. The moving party must demonstrate a palpable error by which the court and the parties have been misled and show that a different disposition of the motion must result from correction of the error.

The new majority states that MCR 2.119(F)(3) "creates a 'palpable error' standard for rehearing cases." *Ante* at 12 n 12. The actual standard created is: "a palpable error *by which the court and the parties have been misled* . . . ." Neither the parties nor the new majority suggest that this Court was previously misled. Plaintiffs and the new majority simply disagree with this Court's prior opinion for the reasons previously stated in the flawed analysis of Justice WEAVER's dissent.

[7] 51 Mich 11; 16 NW 185 (1883).

> This case having been heard and decided when three judges only were sitting, and a change in the Court having taken place and a further change being [about] to occur on the first of January, a motion is now made for a rehearing at the next January term before the full Court as it will then be constituted.

> *Held*, unanimously, that a rehearing will not be ordered on the ground merely that a change of members of the bench has either taken place or is about to occur.[8]

By ordering rehearing simply because a change in the Court has taken place, the new majority has overruled the longstanding and clear principle of *Peoples*.[9] Will any change in an assigned judge now justify the reopening of a predecessor's ruling?

It is apparent that the new majority feels unencumbered by such principles—even one that has endured for more than 100 years. And, perhaps, its members no longer feel a need to be cosseted by the concerns and beliefs that they professed to have for the past decade when they were members of the philosophical minority of this Court. Indeed, Chief Justice KELLY once exclaimed that a recent decision of the Court being reconsidered "has hardly had time to become outmoded."[10] Justice CAVANAGH similarly protested that "[i]f a majority of the Court believes that reconsideration should be granted, then I believe that the *proper* course would be to receive briefs and hear arguments on

---

[8] *Id.* at 21.

[9] The restraint demonstrated by this Court in *Peoples* has been duplicated by other courts denying rehearing when the sole basis is a change in the composition of the court. See *Golden Valley Co v Greengard's Estate*, 69 ND 171, 190; 284 NW 423 (1938); *Gas Products Co v Rankin*, 63 Mont 372; 207 P 993 (1922); *Wolbol v Steinhoff*, 25 Wyo 227, 258; 170 P 381 (1918); *Woodbury v Dorman*, 15 Minn 341 (1870); *Stearns v Hemmens*, 3 NYS 16 (NY Comm Pl, 1888).

[10] *McCready v Hoffius*, 459 Mich 1235, 1236 (1999) (KELLY, J., dissenting).

the defendant's constitutional argument before re-
manding the case to the trial court."[11]

Because nothing in the facts, arguments, or legal
rationale has changed, I continue to support this
Court's original decision and do not feel the need to
restate it in its entirety here.

### III. FACTS AND PROCEDURAL HISTORY

The facts and procedural history of these consoli-
dated appeals are simple, uncontested, and have been
set out by this Court in detail three times.

The central question here is whether an insurance
company that strikes a bad bargain with its insured
may fob off on the Michigan Catastrophic Claims Asso-
ciation (MCCA), a nonprofit entity created by the Leg-
islature to spread the costs associated with catastrophic
automobile injuries, these "unreasonable" expenses. In
our earlier decision, we held that the MCCA had explicit

---

[11] *Id.* at 1236-1237 (CAVANAGH, J., dissenting) (emphasis added). Unlike
this case, the defendants in *McCready* cited new authority for their
position. Nevertheless, Chief Justice KELLY and Justice CAVANAGH were
adamant that this Court erred by considering the new authority on
rehearing. It is indeed *at least* curious that Chief Justice KELLY and
Justice CAVANAGH opposed the remand order in *McCready*, which was
premised on *new* authority, but freely joined this Court's order for
rehearing "without further briefing or oral argument," *United States
Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 483
Mich 918 (2009), and the reversal of this Court's opinion without any new
issues being raised.

Moreover, I find it odd that Justice HATHAWAY, who, during her Supreme
Court campaign, actively promoted the fabrication that former Chief Justice
TAYLOR slept through the oral argument of *McDowell v Detroit*, 477 Mich
1079 (2007), finds it appropriate to cast her vote to overturn this Court's
decision without so much as attending argument on this case or allowing the
party opposing the motion to have its day in court. See minutes 4:28 to 4:40
of the video at <http://www.youtube.com/watch?v=_7woWJDk1Qg> (ac-
cessed June 3, 2009).

statutory authority to resist assuming responsibility for an insurance company's *unreasonable* payouts.

Plaintiff United States Fidelity & Guaranty Company (USF&G) entered into a consent judgment with its insured, Daniel Migdal, which resulted in USF&G paying $54.84 an hour for attendant care services.[12] Plaintiff Hartford Insurance Company of the Midwest (Hartford) entered into a settlement agreement with its insured, Robert Allen, which required that Hartford pay $30 an hour for attendant care services. The MCCA refused to indemnify USF&G and Hartford beyond a rate of $22.05 and $20 respectively, rejecting the higher amounts as "unreasonable."

Plaintiffs brought these actions seeking declaratory judgments that the MCCA was required to reimburse the full rate of attendant care services that they paid their insureds. The circuit courts entered conflicting judgments and the aggrieved parties appealed. The

---

[12] The debate here is not whether an insurance company may refuse to fully compensate a catastrophically injured insured. Indeed, the plaintiff insurance companies were required to fully compensate their insureds under *USF&G I*. The question is whether an insurance company can agree to *overcompensate* its insured and escape this burden by having the rest of Michigan policyholders pay for that bad bargain. This very issue is well illustrated by the facts of *USF&G I* itself.

The rate that USF&G pays its insured, Daniel Migdal, to cover costs associated with his catastrophic injuries is so inflated that his father (Daniel's "caregiver") started a company, Medical Management, to make a profit from the arrangement. From the $54.84 hourly payments that USF&G makes, Medical Management pays the nurses (who actually provide Daniel's care) an average of $32 an hour (*including benefits!*) and retains the remainder of the USF&G hourly payment for itself. So inflated was the USF&G payment that, after paying for *all* of Daniel's care, Medical Management earned from this arrangement approximately $200,000 *in profits* for 2003. Under the majority's new opinion, it will be *Michigan policyholders*, not USF&G, who will pay for the profits of Daniel's father.

Court of Appeals consolidated the appeals and held that
"the MCCA is statutorily required to reimburse an
insurer for 100 percent of the amount that the insurer
paid in PIP [personal protection insurance] benefits to
an insured in excess of the statutory threshold listed in
MCL 500.3104(2), regardless of the reasonableness of
these payments."[13] The MCCA sought leave to appeal in
this Court, which was granted, and this Court held that
"when a member insurer's policy only provides cover-
age for 'reasonable charges,' the MCCA has authority to
refuse to indemnify unreasonable charges."[14]

*Because* the composition of this Court changed on
January 1, 2009, USF&G and Hartford sought rehear-
ing[15] and the new majority granted this motion "with-
out further briefing or oral argument."[16]

IV. DISCUSSION

As previously noted, at issue is whether the MCCA
has the authority to refuse to indemnify member insur-
ers for unreasonable payments they make to their
policyholders. I agree with many points of the majori-
ty's new opinion, but the points of my disagreement are
significant and the results of our differences will be
extremely costly to the citizens of Michigan.

---

[13] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic
Claims Ass'n*, 274 Mich App 184, 192; 731 NW2d 481 (2007).

[14] *USF&G I, supra* at 417.

[15] In its reply brief filed February 19, 2009, USF&G argued that "this
Court's practice of granting rehearing requests based on nothing more
than a view of a majority of the Justices that the Court's original opinion
is incorrect . . . is as it should be, given this Court's status as a court of
last resort." This statement both ignores *Peoples* and betrays plaintiffs'
motivation for seeking rehearing.

[16] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic
Claims Ass'n*, 483 Mich 918 (2009).

I agree that "personal protection insurance benefits" are not the same as "personal protection insurance coverages."[17] I further agree that "the term 'coverage' is a broader term than 'benefits.' "[18] I particularly agree with each of the definitions for "coverages" cited by the new majority.[19] " '[C]overage' refers to protection afforded by an insurance *policy* or the sum of risks assumed by an insurance *policy*."[20] I disagree, however, with the new majority's refusal to interpret "coverages" consistent with the definitions that it cites—a reference to the underlying insurance policy.

The majority states its holding: "the indemnification obligation set forth in MCL 500.3104(2) does not incorporate the reasonableness standard that MCL 500.3107 requires between claimants and member insurers."[21] That is true but unresponsive to this Court's holding in

---

[17] *Ante* at 14. Justice WEAVER asserts that "the terms 'benefits' and 'coverages' are related because of their close proximity in the statute . . . ." *Ante* at 15. I am unfamiliar with this tenet of statutory construction, and Justice WEAVER offers no authority for it. Indeed, whether separated by two words or two hundred, I believe that the meaning of "benefits" and "coverages" are related, but distinct.

[18] *Ante* at 15.

[19] *Ante* at 15, quoting *LeBlanc v State Farm Mut Auto Ins Co*, 410 Mich 173, 204; 301 NW2d 775 (1981), for the proposition that " '[c]overage', a word of precise meaning in the insurance industry, refers to protection afforded by an insurance policy, or the sum of the risks assumed by a policy of insurance." The new majority also cites the following consistent definitions: (1) the "[e]xtent of protection afforded by an insurance policy [or the] amount of funds reserved to meet liabilities"; (2) "protection against a risk or risks specified in an insurance policy"; (3) "the risks within the scope of an insurance policy"; and (4) the "amount, and extent of risk covered by insurer." *Ante* at 16, quoting *Webster's II New College Dictionary* (1995); *Random House Webster's College Dictionary* (2001); Black's Law Dictionary (7th ed); and Black's Law Dictionary (5th ed). See *USF&G I, supra* at 431 n 31.

[20] *USF&G I, supra* at 431 n 31 (emphasis added), quoting *Jarrad v Integon Nat'l Ins Co*, 472 Mich 207, 217; 696 NW2d 621 (2005).

[21] *Ante* at 6; see also *ante* at 25.

*USF&G I.* This Court did not previously incorporate the § 3107 standard for personal protection insurance (PIP) benefits into § 3104(2). Rather, this Court, consistent with the definitions advanced by the majority, interpreted "coverages" as the "protection afforded by an insurance *policy*" and explained that "the member insurer's *policy* will ultimately control the standard for the MCCA's review because the *policy* establishes the 'personal protection insurance coverages.' "[22]

Referring to the consent judgment and settlement agreement at issue, the new majority contends that "[t]his contractual liability, *or coverage*, owed by each insurer is the total amount agreed to between the original contracting parties."[23] The fallacy in this assertion is that the consent judgment or settlement agreement is "coverage." As amply demonstrated by the definitions that the majority cites, "coverage" refers to the underlying *policy* purchased by the insured. That *policy* is the only relevant contract. The consent judgment and settlement agreement are separate contractual, albeit judicially sanctioned, agreements. They are distinctly *not* "the no-fault personal protection insur-

---

[22] *USF&G I, supra* at 430-431; *id.* at 431 n 31 ("Thus, the terms of the *policy* control the standard for the MCCA's review."). This fundamental distinction was underscored by Justice MARKMAN in his concurrence:

The dissent is correct that the reasonableness requirement of MCL 500.3107 is not integrated into the indemnification clause set forth in § 3104(2). [*USF&G I, supra*] at 457 [(WEAVER, J., dissenting)]. However, the majority opinion does not attempt to incorporate this requirement into the MCCA's statutory power to review a member insurer's claim to ensure it is in compliance with the policy. Rather, it holds that the MCCA can review a member's claim for compliance *with the policy*, which, as represented by both parties, generally includes a requirement that member insurers reimburse only *reasonable* claims based on § 3107. [*USF&G I, supra* at 434 n 1 (MARKMAN, J., concurring).]

[23] *Ante* at 16 (emphasis added).

ance coverages that are generally the subject of the act, i.e., those which were written in this state to provide the compulsory security requirements of § 3101(1) of the no-fault act for the 'owner or registrant of a motor vehicle required to be registered in this state' . . . ."[24] Because the majority offers no principled rationale for departing from the definitions that it cites or this Court's prior interpretation of "personal protection insurance coverages," I must respectfully dissent.

The majority makes additional erroneous assertions. First, the majority asserts that member insurers will have an incentive to make reasonable settlements of catastrophic claims because, if they do not, the MCCA premiums will increase.[25] The majority appears unaware of how incentives, or the MCCA, work. The premium that the MCCA charges to cover the liabilities it must statutorily assume is evenly distributed among the member insurers[26] and then passed on to those who

---

[24] *In re Certified Question (Preferred Risk Mut Ins Co v Michigan Catastrophic Claims Ass'n)*, 433 Mich 710, 723; 449 NW2d 660 (1989). See also *USF&G I, supra* at 437-439 (MARKMAN, J., concurring) (explaining that the consent judgment and settlement agreement are not part of the member insurer's "coverages" because "[a] member insurer that informs the MCCA that it will only pay 'reasonable' claims, but then subsequently modifies the policy after the accident occurs to include unreasonable claims, has essentially sought reimbursement for claims for which it has not paid premiums").

[25] *Ante* at 17 n 19.

[26] See MCL 500.3104(7)(d), which provides in pertinent part:

Each member shall be charged an amount equal to that member's total written car years of insurance providing the security required by [MCL 500.3101(1)] or [MCL 500.3103(1)], or both, written in this state during the period to which the premium applies, multiplied by the average premium per car. The average premium per car shall be the total premium calculated divided by the total written car years of insurance providing the security required by section 3101(1) or 3103(1) written in this state of all members during the period to which the premium applies.

buy no-fault insurance.[27] Indeed, this Court has been informed that in *response to the order granting rehearing in this case,* the MCCA raised its rates by 19 percent per policy (or $693.8 million more for MCCA assessments in the aggregate for this year) to create the reserves necessary to pay the more expansive claims for unreasonable charges that the new majority's opinion permits. Contrary to the new majority's belief that an insurer will have an economic incentive to bargain for "reasonable" payments to its insureds, the majority opinion will have the perverse effect of eliminating an insurer's incentive to negotiate reasonable settlements. Indeed, instead of providing insurers a protective shield against unreasonable catastrophic claims, the majority opinion provides no-fault plaintiffs' attorneys a lethal sword against an insurer that insists on a reasonable settlement. MCL 500.3148(1) provides that a claimant's attorney fee is charged to the insurer "if the court finds that the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment." Under the majority's decision, an insurer has no reason to refuse any claim; thus, a claimant's attorney can use the threat of attorney fees to force an insurer into an unreasonable settlement.[28] Under the majority's decision, insurers will be encouraged to negotiate *un*reason-

---

[27] See *USF&G I, supra* at 432 n 32; *In re Certified Question, supra* at 729 (explaining that the MCCA premiums are "inevitably" "passed on" to Michigan's no-fault insurance customers); MCL 500.3104(22) (which provides that "[p]remiums charged members by the association shall be recognized in the rate-making procedures for insurance rates in the same manner that expenses and premium taxes are recognized").

[28] The MCCA provided a useful hypothetical conversation between a future plaintiff's no-fault attorney and an insurer:

[Attorney]: I know that amount is a bit high for attendant care, but that is what we want. We'll sue to get it and we'll seek attorney fees and penalties too. [MCL 500.3148(1)] Do you want that?

able settlements and pass these off onto the MCCA. As stated, any liability that the MCCA must assume is eventually passed on to anyone in Michigan who must buy auto insurance.

Perhaps the majority can explain why the legislative method for containing costs for Michigan's no-fault insurance customers is an inferior purpose to their preferred policy objective. In particular, why is it an inferior purpose at a time when the Governor has requested an auto insurance rate freeze[29] and unemployment in Michigan has exceeded 14 percent?[30]

My point is not that our decision should be premised on keeping no-fault insurance affordable. Indeed, I maintain that such " '[p]olicy decisions are properly left for the people's elected representatives in the Legislature' "[31] and that the Legislature *has* made the policy decision in this case. Rather, I raise this issue because elections matter. The majority has seen fit to engage in its own policy-making while relying on erroneous assumptions. This is a lethal combination that will result in harmful, unintended consequences. While it may be

---

Insurer: Of course not, but that amount is unreasonable.

[Attorney]: What does reasonable have to do with it? [The] MCCA has to pay you regardless. Do you want to incur three times that amount in attorney fees instead?

Insurer: Of course not.

[29] See Executive Directive No. 2009-1.

[30] See Louis Aguilar, *Michigan's jobless rate 14.1%, highest since '83*, Detroit News, June 18, 2009; Heather Lockwood, *State jobless rate of 14.1% is highest—since July '83*, Lansing State Journal, June 18, 2009, available at <http://www.lansingstatejournal.com/atricle/20090618/ NEWS01/906180327> (accessed June 28, 2009).

[31] *USF&G I, supra* at 432 n 32, quoting *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 589; 702 NW2d 539 (2005).

politically expedient to position oneself as "looking out
for the little guy,"[32] this case is an excellent example of
how acting on such an altruistic impulse rather than
applying the law results in a negative consequence for
the vast majority of our citizens. In this context, each of
us who must purchase this mandatory no-fault coverage
is a "little guy."[33]

Second, the majority emphasizes that the MCCA
may *only* adjust a member insurer's "practices and
procedures."[34] The majority then immediately (and
inconsistently but accurately) concedes that MCL
500.3104(7)(g) permits the MCCA to "adjust or assist in
the adjustment of claims" and "[w]hen the MCCA
asserts its power to adjust or assist in the adjustment of
a claim, the MCCA effectively steps into the shoes of the

---

[32] See, e.g., Todd C. Berg, *Hathaway attacks, but sketchy on incumbent's
record*, Michigan Lawyers Weekly, October 7, 2008, p 14 ("The center-
piece of Hathaway's campaign against Taylor has been her claim that he
rules against middle-class families and in favor of 'big insurance compa-
nies and corporate special interests.'"); Todd C. Berg, *Hathaway's
campaign pledge may support MSC office closure*, Michigan Lawyers
Weekly, December 15, 2008, p 1 ("Justice-elect Diane M. Hathaway ran
for the Michigan Supreme Court on the platform that she would stand up
for middle-class families and oppose the lavish perks and benefits that
Supreme Court justices were bestowing on themselves.").

[33] The exception, of course, is the lawyer who makes a living doing
no-fault insurance work. For such practitioners, the majority's opinion
creates a new submarket of opportunity. See note 28 of this opinion.

[34] *Ante* at 21-22. See MCL 500.3104(7)(g), which provides that the
MCCA shall

[e]stablish procedures for reviewing claims procedures and prac-
tices of members of the association. If the claims procedures or
practices of a member are considered inadequate to properly
service the liabilities of the association, the association may
undertake or may contract with another person, including another
member, to adjust or assist in the adjustment of claims for the
member on claims that create a potential liability to the associa-
tion and may charge the cost of the adjustment to the member.

member insurer."[35] I previously agreed with these propositions.[36] Thus, I struggle to comprehend for what purpose the majority resists the simple proposition that the MCCA is statutorily authorized to adjust claims.

Third, "[p]laintiffs argue[d] that if the MCCA may reject member insurer claims on the basis of the reasonableness of the charges, member insurers will need to seek assurances that the MCCA will reimburse certain payments before making them, thus delaying payment."[37] The prospect of delayed payment seems to be a primary concern that drives the new majority's analysis. In support of its construction, it contends:

> If this Court were to accept the MCCA's argument, the logical consequence would be that member insurers would be reluctant to settle with the claimant. Member insurers might then force a jury trial with every catastrophically injured claimant in order to secure a verdict with a "reasonable" stamp on the result.[38]

The majority employs this policy-based rationale to depart from its own definitions of "coverages" because otherwise "[t]his outcome goes against the legislative purpose of ensuring efficient and quick recovery for claimants in the no-fault system."[39] The majority fails to explain, however, how its alternative construction actually resolves the issue. In fact, it does not.

The majority concedes that the MCCA *has authority to "requir[e]* submission of proposed settlement agree-

---

[35] *Ante* at 22 n 24.

[36] *USF&G I, supra* at 430 n 30.

[37] *Id.* at 432 n 32.

[38] *Ante* at 19.

[39] *Ante* at 19.

ments for approval . . . ."[40] This is the very outcome that
the plaintiff insurance companies here sought to avoid.
Indeed, I believe that "requiring submission of proposed
settlement agreements" or "seeking assurances that the
MCCA will reimburse certain payments" would have been
a natural consequence of *USF&G I*, because it actually
gave meaning to the plain language of this statute. The
MCCA is likely to act on the majority's advice (indeed, it
*should*) and mandate that member insurers afford it the
opportunity to object to proposed settlements or other
agreements *before* they become binding. Ironically, it ap-
pears that even the majority does not deny that the MCCA
has this statutory power.

Thus, the issue of delay is not resolved by the majority's
opinion. Moreover, the majority's opinion does not address
circumstances, like the present cases, where the MCCA
was *not* afforded an opportunity to reject the agreements,
which likely explains the $693.8 million bill that will be
passed onto and shared by every Michigan automobile
owner because of the increased and uncontrolled liability
that the new majority's opinion will create for the MCCA.

We, as jurists, are ill-prepared to make complicated
policy-based judgments unrelated to the policy choices
that the Legislature has enacted. We do the least
damage when we merely follow the Legislature's lead by
giving the words of a statute a plain reading and enforc-

---

[40] *Ante* at 22. The majority acknowledges this authority within the
context of reading MCL 500.3104(7)(g) in conjunction with § 3104(7)(b),
which provides that the MCCA shall

[e]stablish procedures by which members shall promptly report to
the association each claim that, on the basis of the injuries or
damages sustained, may reasonably be anticipated to involve the
association if the member is ultimately held legally liable for the
injuries or damages. Solely for the purpose of reporting claims, the
member shall in all instances consider itself legally liable for the
injuries or damages. *The member shall also advise the association of
subsequent developments likely to materially affect the interest of the
association in the claim.* [Emphasis added.]

ing the statute as written. "The Legislature, unlike the judiciary, is institutionally equipped to assess the numerous trade-offs associated with a particular policy choice."[41] The Legislature has made difficult choices, and it used particular words with particular meanings to convey those choices. Our prior opinion respected our role as jurists, and the Legislature's role as policy-maker, by interpreting the relevant statutory language in a manner consistent with the plain meaning of the words chosen by the Legislature. In an effort to avoid the meaning of the words chosen by the Legislature, the new majority has engaged in a wandering, policy-based analysis that is as flawed as it is misguided. It is an expensive mistake for which every policyholder in Michigan will pay.

Undeterred and aiming to quell the likely negative response to its policy-based decision, the new majority asserts that my concerns "appear[] highly speculative and, indeed, unfounded."[42] My concerns will cease to be "highly speculative" and "unfounded" when they are reflected in the MCCA's annual assessments. Michigan drivers will soon receive their no-fault insurance bills (I have received mine) with the updated higher MCCA assessment for the fiscal year beginning July 1, 2009. At that point, Michigan drivers will be free to determine for themselves whether my concerns are sound and based in reality.

Accordingly, I respectfully dissent.

CORRIGAN, J., concurred with YOUNG, J.

---

[41] *Devillers, supra* at 589. Indeed, the new majority's response to my dissent underscores this point. The new majority asserts that "there is no evidence that defendant has routinely or even occasionally challenged the reasonableness of insurers' settlements" and "it is unknown whether the actuarial assessment factored in the effect of defendant's potential use of [MCL 500.3104(7)(g)]." *Ante* at 24. The Legislature, unlike this Court, has the means to obtain the answers to those questions.

[42] *Ante* at 23.

APPENDIX

STATE OF MICHIGAN

IN THE SUPREME COURT

UNITED STATES FIDELITY INSURANCE
& GUARANTY COMPANY, a foreign
corporation,                                Case No. 133466

            Plaintiff-Appellee,             Court of Appeals Case No. 260604

vs.                                         Oakland Circuit Court No. 03-051485-CK

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION, a non-profit Catastrophic
Claims Association,

            Defendant-Appellant.

---

**AFFIDAVIT OF GLORIA FREELAND IN SUPPORT OF APPELLANT'S
SUPPLEMENT TO ITS ANSWER TO APPELLEE'S MOTION FOR REHEARING**

I, Gloria Freeland, being first duly sworn, depose and swear:

1.     I am the Executive Director of the Michigan Catastrophic Claims Association (the "MCCA"). I have held this position since 2007 and have been employed by the MCCA since 1991.

2.     I have personal knowledge of the facts in the Affidavit, and if called upon to testify, I can do so competently.

3.     Each year the MCCA's consulting actuaries estimate the loss and loss adjustment reserve expenses of the MCCA.

4.     This year, as a direct result of the Michigan Supreme Court's March 27, 2009 order granting the appellees' motion for rehearing, the MCCA's actuaries recommended, and the Board of Directors accepted their recommendation, that the MCCA increase by 10% the estimated $645 million needed to pay claims expected to be incurred for the fiscal accident year beginning July 1, 2009. This represents an increase of $64.5 million.

5.      Further, the actuaries recommended, and the Board of Directors accepted their recommendation, that the MCCA increase its needed reserves as of December 31, 2008 by 5% or $629.3 million as a direct result of the signal sent by the Michigan Supreme Court in granting appellees' motion for rehearing

6.      Increasing by $64.5 million the amount needed to pay claims expected to be incurred for the fiscal accident year beginning July 1, 2009, and increasing the MCCA's needed reserves by $629.3 million, are largely responsible for the increase of more than 19% in this year's assessment.

Gloria Freeland

Dated: April 8, 2009

Subscribed and sworn to before me
this  8th  day of April, 2009

Notary Public
My Commission Expires:

KAREN M. NICK
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Jan 1, 2014
ACTING IN COUNTY OF Wayne

AA0\2257612
ID\KJM - 018940/0039

2

MARKMAN, J. (*dissenting*). I concur fully with the discussion in part IV of Justice YOUNG's dissenting opinion and therefore also dissent.

*Motion for Recusal Denied July 21, 2009:*

UNITED STATES FIDELITY & GUARANTY COMPANY
v MICHIGAN CATASTROPHIC CLAIMS ASSOCIATION, No. 133466,
and HARTFORD INSURANCE COMPANY OF THE MIDWEST v
MICHIGAN CATASTROPHIC CLAIMS ASSOCIATION, No. 133468.

On order of the Court, the motion for recusal is considered, and it is denied.

HATHAWAY, J. On March 27, 2009, this Court issued an order granting rehearing in this matter.[1] Since that time, defendant Michigan Catastrophic Claims Association (MCCA) has filed a motion asking me to recuse myself. The nature of the objection is well described in the parties' briefs and responses thereto.[2] I have reviewed these pleadings in detail.

I have also had an opportunity to review *Caperton v A T Massey Coal Co, Inc,* 556 US __ ; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), and the briefs filed by the parties regarding this new decision. In reviewing whether there was a due process violation in the refusal of Justice Benjamin[3] to disqualify himself, the United States Supreme Court held as follows:

> We conclude that there is a serious risk of actual bias—based on objective and reasonable perceptions—when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the

---

[1] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n,* 483 Mich 918 (2009).

[2] The motion and related documents, including all the briefs of the parties and the amici curiae, may be viewed at <http://courts.michigan.gov/supremecourt/Clerk/10-08/133466-133468/133466-133468-Index.htm>.

[3] Justice Benjamin sits on the West Virginia Supreme Court of Appeals and had received in excess of $3 million in financial support to his campaign from the individual who was chairman, chief executive officer, and president of the defendant in the case before him.

case by raising funds or directing the judge's election cam-
paign when the case was pending or imminent . . . .

* * *

Our decision today addresses an *extraordinary* situation
where the Constitution requires recusal. Massey and its
*amici* predict that various adverse consequences will follow
from recognizing a constitutional violation here—ranging
from a flood of recusal motions to unnecessary interference
with judicial elections. We disagree. *The facts now before us
are extreme by any measure.* The parties point to no other
instance involving judicial campaign contributions that pre-
sents a potential for bias comparable to the circumstances in
this case. [*Id.*, slip op at 14, 16-17 (emphasis added).]

Given this test, I find no arguable due process
violation in the cases before me. There is nothing
alleged by the MCCA that would cause any reasonable
person to believe that there is a significant and dispro-
portionate influence being asserted upon me under any
objective analysis.

Despite the theories proffered by the MCCA, my
husband has no connection to or financial interest in
this matter. He is not an attorney for or employee of
any party, nor is he a litigant in either of these cases.
He has no relationship with either the attorneys or
the litigants in these cases. The MCCA asserts that,
because my spouse has handled cases in the field of
no-fault insurance law, I must recuse myself. How-
ever, this assertion suggests a basis for recusal that is
so attenuated from the facts of these cases that it
strains reasoned logic.

This is not to say that parties should be impeded from
bringing such motions. However, not every hypothetical
theory proffered by a litigant must be accepted as accurate
or controlling. The issue to be decided is one of due
process. Any alleged due process claim must be evaluated

by an objective standard. Due process does not require that a justice recuse himself or herself merely because the justice's spouse or child is an attorney practicing in the field of law that is involved in the disputed case, just as due process would not require a justice's recusal in all medical malpractice cases merely because the justice's spouse is a physician or require a justice's recusal in all cases involving school systems merely because the justice's spouse is a teacher.

In conclusion, I have no personal bias or prejudice for or against any party in this matter. Moreover, neither I nor any member of my immediate family has any real or arguable financial interest in this case. The allegations made by the MCCA are not a basis for recusal because there is no appearance of impropriety and no due process violation. Accordingly, there is no reason to recuse myself.[4] Having carefully considered this motion for recusal, I deny it.[5]

KELLY, C.J., and CAVANAGH, J. We concur with the statement of Justice HATHAWAY.

WEAVER, J. I agree with Justice HATHAWAY's denial of the recusal motion because due process is not violated in this case.

---

[4] Currently, there are no rules governing the recusal of justices. On March 18, 2009, a majority of this Court voted to publish for comment various proposals for rules that would govern the recusal of justices. 483 Mich 1205 (2009). Until such time as comprehensive rules governing the recusal of justices in Michigan are adopted, I will follow this Court's current practice whereby the justice from whom recusal is sought decides the motion for recusal. Michigan's current recusal practice is the same as that of the United States Supreme Court, and there is no indication in *Caperton* that this practice violates due process.

[5] While I do not acquiesce to the statements of Justices CORRIGAN, MARKMAN, and YOUNG, I will not participate in this Court's practice of engaging in responses to comments of others that are inappropriate and unnecessary. This Court should discontinue devoting the state's limited resources to unproductive colloquy.

I take this opportunity to provide some history on the issue of disqualification in this Court. Since 2003, I have raised the issue of the need for clear, written, and fair disqualification rules for Michigan Supreme Court justices,[1] but the "majority of four" (former Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN) refused to address the issue. When this Court looked at the issue of disqualification in 2006, the "majority of four" refused to publish proposed disqualification rules formulated by members of this Court.

In March of this year, after former Chief Justice TAYLOR's removal from this Court as a result of his overwhelming defeat in the 2008 election, the "remaining three" (Justices CORRIGAN, YOUNG, and MARKMAN) voted against publishing proposed rules for disqualification. Fortunately, a majority voted in March to publish, for public comment until August 1, 2009,

---

[1] See, e.g., the statements or opinions by WEAVER, J., in *In re JK*, 468 Mich 202, 219 (2003); *Gilbert v DaimlerChrysler Corp*, 469 Mich 883 (2003); *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 472 Mich 91, 96 (2005); *McDowell v Detroit*, 474 Mich 999, 1000 (2006); *Stamplis v St John Health Sys*, 474 Mich 1017 (2006); *Heikkila v North Star Trucking, Inc*, 474 Mich 1080, 1081 (2006); *Lewis v St John Hosp*, 474 Mich 1089 (2006); *Adair v Michigan*, 474 Mich 1027, 1044 (2006); *Grievance Administrator v Fieger*, 476 Mich 231, 328 (2006); *Grievance Administrator v Fieger*, 477 Mich 1228, 1231 (2006); *People v Parsons*, 728 NW2d 62 (2007); *Ruiz v Clara's Parlor, Inc*, 477 Mich 1044 (2007); *Neal v Dep't of Corrections*, 477 Mich 1049 (2007); *State Automobile Mut Ins Co v Fieger*, 477 Mich 1068, 1070 (2007); *Ansari v Gold*, 477 Mich 1076, 1077 (2007); *Short v Antonini*, 729 NW2d 218, 219 (2007); *Flemister v Traveling Med Services, PC*, 729 NW2d 222, 223 (2007); *McDowell v Detroit*, 477 Mich 1079, 1084 (2007); *Johnson v Henry Ford Hosp*, 477 Mich 1098, 1099 (2007); *Tate v City of Dearborn*, 477 Mich 1101, 1102 (2007); *Dep't of Labor & Economic Growth v Jordan*, 480 Mich 869 (2007); *Cooper v Auto Club Ins Ass'n*, 739 NW2d 631 (2007); and *Citizens Protecting Michigan's Constitution v Secretary of State*, 482 Mich 960 (2008).

Also see my personally funded website, www.justiceweaver.com.

three proposals for rules of disqualification[2] to be considered at a public hearing later in 2009. Of the proposals published by this Court in March, I note that Alternative C sufficiently provides the due process protections laid out by the United States Supreme Court in the recent decision of *Caperton v A T Massey Coal Co, Inc*, 556 US ___ ; 129 S Ct 2252; 173 L Ed 2d 1208 (2009).

I also note that the United States Supreme Court's *Caperton*[3] discussion of disqualification with regard to campaign contributions for justice elections raises further issues with regard to due process concerns. Currently, this Court has no rules providing for a justice's disclosure of campaign contributions when parties to cases, or the parties' immediate family members, contribute significant amounts of money, directly or indirectly, to a justice's campaign.[4] Hopefully this Court, the Legislature, and/or the public will create disclosure rules that will ensure the protection of due process rights.

CORRIGAN, J. I would not resolve the recusal motion of defendant Michigan Catastrophic Claims Association (MCCA) at this time. Rather, I would order supplemental briefing of the application of *Caperton v A T Massey Coal Co, Inc*, 556 US ___ ; 129 S Ct 2252; 173 L Ed 2d 1208 (2009) (*Caperton*), to these cases. *Caperton* addressed the disqualification of a judge when a party alleges that the judge's interest in a case requires recusal under the Due Process Clause of the federal

---

[2] These three proposals are the same proposals that the "majority of four" refused to publish in 2006.

[3] Justices CORRIGAN and YOUNG and former Chief Justice TAYLOR filed an amicus curiae brief in the *Caperton* case in opposition to the plaintiff Caperton's ultimately successful appeal.

[4] Beyond due process issues involving campaign contributions, I further note that this Court does not have rules ensuring due process by requiring disclosure by justices of their former representation as attorneys of parties appearing before the Court, regardless of how far in the past the representation may have been.

constitution. To weigh whether recusal is required, *Caperton* requires an assessment of whether a serious, objective risk of actual bias exists that requires the judge to recuse himself or herself. Because the MCCA argues that Justice HATHAWAY's participation in these cases violates its federal due process rights, *Caperton* is relevant and could prove controlling. Indeed, the MCCA has submitted *Caperton* to this Court as supplemental authority in support of its motion.

The scope of *Caperton* and how courts will implement it present significant unanswered questions, particularly for our Court. *Caperton* held that a state supreme court justice was disqualified from hearing a case involving a corporate party whose chairman and CEO had expended $3 million to support the justice's campaign, although the individual expended this money independently and through donations to an independent political group. *Caperton*, 129 S Ct at 2257. The Court concluded that the justice was disqualified although he professed that the funds were solicited and expended without his knowledge, direction, or control under state election laws very similar to our own. See *Caperton v A T Massey Coal Co, Inc*, 223 W Va 624, 703-705; 679 SE2d 223 (2008) (*W Va Caperton*) (Benjamin, acting C.J., concurring). Indeed, Michigan allows independent political groups to expend unlimited money during elections, often without being required even to reveal their funding sources.[1] For example, during the 2008 election cycle, independent

---

[1] The Michigan Campaign Finance Act, MCL 169.201 *et seq.*, does not regulate certain expenditures, including those "for communication on a subject or issue if the communication does not support or oppose a ballot question or candidate by name or clear inference." MCL 169.206(2)(b). See also *Right to Life of Michigan, Inc v Miller*, 23 F Supp 2d 766, 767 (WD Mich, 1998), quoting *Buckley v Valeo*, 424 US 1, 44 & n 52 (1976) (observing that Michigan is prohibited from

expenditures aimed at the race for Justice HATHAWAY's current seat on this Court topped $3.75 million.[2]

For these reasons, in my view, deciding the MCCA's recusal motion within days of *Caperton* is precipitous. *Caperton* was released on June 8, 2009. We have hardly had time to digest the opinion, much less its ramifications, particularly given that the opinion is positively Delphic in explaining the standards for courts attempting to implement it. Four justices of this Court now vote, without any explanation or the benefit of fact-finding, to support Justice HATHAWAY's decision to participate in these cases. Thus, although we have had little time to study *Caperton* and do not have the benefit

---

regulating speech protected by the "express advocacy" test established in *Buckley*, which permits regulation only of "communications that 'in express terms advocate the election or defeat of a clearly identified candidate,' " such as those employing " 'express words of advocacy of election or defeat, such as "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," "reject" ' "); *Planned Parenthood Affiliates of Michigan, Inc v Miller*, 21 F Supp 2d 740, 745 (ED Mich, 1998) (noting that Michigan is prohibited under *Buckley* from regulating "issue advocacy"). Therefore, in practice, many major expenditures, including those for television ads, are not covered by our reporting laws. See Michigan Campaign Finance Network, 2008 Citizen's Guide to Michigan Campaign Finance, p 14 <http://www.mcfn.org/pdfs/reports/MCFNCitGuide08.pdf> (accessed June 18, 2009) (hereinafter "MCFN Citizen's Guide") ("[A]dvertisements that define[] the character and qualifications of the candidates without explicitly exhorting a vote for or against either candidate" are "not considered to be campaign expenditures and the sources of money that paid for the ads are not required to be disclosed."). Accordingly, although a major expenditure may ultimately benefit a candidate, the expenditure—and its funding sources—may be outside the candidate's awareness and control. Further, even regulated "independent expenditures" by third parties, which must be reported if they support a candidate, *must* be made without the direction or control of the candidate. MCL 169.209(2); MCL 169.251.

[2] MCFN Citizen's Guide, p 14; see also Michigan Campaign Finance Network, *Anonymous donors dominated Supreme Court campaign*, November 19, 2008 <http://www.mcfn.org/press.php?prId=77> (accessed June 18, 2009) ("More than 60 percent of spending for the Michigan Supreme Court campaign between incumbent Chief Justice Clifford Taylor and Judge Diane Marie Hathaway will not be disclosed in any campaign finance report because it paid for candidate-focused 'issue' advertising.").

of briefing on it, the Court proceeds essentially to hold
that such a vote is a mandatory procedure for all recusal
motions raising due process concerns.[3]

### THE MCCA'S MOTION FOR RECUSAL

The most relevant aspects of the MCCA's motion fol-
low. After this Court issued its March 2009 decision to
grant reconsideration[4] of its December 2008 decision,[5]
occasioned by newly elected Justice HATHAWAY's partici-

---

[3] This occurs although *Caperton* has sparked much debate concerning its
application. For example, *Michigan Lawyers Weekly* quoted former Michi-
gan State Supreme Court Chief Justice CLIFFORD TAYLOR as stating that
*Caperton* " 'has to mean that the challenged justice can't make the recusal
decision alone.' " *MSC recusal rule may not be constitutional,* Michigan
Lawyers Weekly, June 15, 2009, p 23. Chief Justice KELLY also asserted, in a
recent press release, that *Caperton* " 'signals that we do need to have
appropriate protections in place' " and "will assist the Michigan Supreme
Court as it develops its own disqualification rules for justices." Michigan
Supreme Court, Office of Public Information, Caperton *ruling by U.S.
Supreme Court highlights importance of fair and impartial justice, says
Michigan Supreme Court Chief Justice Marilyn Kelly,* June 9, 2009
<http://courts.michigan.gov/supremecourt/Press/060909-CapertonDQ.pdf>
(accessed June 18, 2009). Wayne County Assistant Prosecuting Attorney
Timothy Baughman, on the other hand, "[r]espectfully" but "heartily"
disagreed with former Chief Justice TAYLOR's comments, asserting in a
*Michigan Lawyers Weekly* Viewpoint comment:

> *Caperton* is a case about standards and not about the identity
> of the decision-maker. . . .

> \*   \*   \*

> Nothing in *Caperton* requires that the decision on a recusal
> motion be reviewed by another justice or body of justices. For the
> Michigan Supreme Court [to continue] to follow the practice of the
> U.S. Supreme Court is perfectly permissible, so long as a system of
> "objective rules" exists. [*'Caperton' was about recusal standards,
> not decision maker,* Michigan Lawyers Weekly, June 22, 2009, p 7.]

[4] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic
Claims Ass'n,* 483 Mich 918 (2009).

[5] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic
Claims Ass'n,* 482 Mich 414 (2008).

pation in these cases, the MCCA moved for her recusal. Specifically, the MCCA argues that Justice HATHAWAY's husband, Michael Kingsley, has an interest that could be substantially affected by the outcome of the proceedings because he is a practicing plaintiffs' no-fault attorney in Michigan. As such, he has a direct interest that is more than *de minimis* in the MCCA's unlimited obligations to reimburse insurers for personal protection insurance benefits paid to insureds who have been catastrophically injured in automobile accidents.[6] The MCCA further asserts that it reimburses insurers for payments made to Kingsley's clients, having made such

---

[6] The MCCA has an unlimited statutory obligation to reimburse insurers for 100 percent of claims paid to insureds whose losses due to personal injury exceed certain statutory caps; the current cap is $460,000. MCL 500.3104(2)(i) and (7)(a). As is further explained by Justice YOUNG, *post* at 62, the MCCA asserts that reversal of this Court's prior opinion on rehearing will require the MCCA to reimburse all benefits paid by insurers to their catastrophically injured insureds, without regard to the reasonableness of the insured's underlying expenditures. Accordingly, the MCCA states that its insurer members will have little incentive to defend unreasonable claims by their insureds; no matter how unreasonable the expenditure—at issue in one of these cases, for example, are an insured's expenditures of $54.84 an hour for attendant care services—if the insurer accepts its insured's claim, the MCCA will be obligated to reimburse the insurer in full. The MCCA asserts: "With a guarantee of MCCA reimbursement, coupled with the lure of saving legal defense costs, members will have a strong motive to settle [personal protection insurance] claims early and with little or no resistance." It concludes: "This directly benefits lawyers like Mr. Kingsley who represent plaintiffs in no-fault automobile insurance cases, and who typically receive their fees out of the proceeds of settlements." To illustrate, the MCCA has provided a hypothetical conversation between a future plaintiff's attorney and an insurer:

[Attorney]: "I know that amount is a bit high for attendant care, but that is what we want. We'll sue to get it and we'll seek attorney fees and penalties too. [See MCL 500.3148(1).] Do you want that?"

Insurer: "Of course not, but that amount is unreasonable."

[Attorney]: "What does reasonable have to do with it? [The] MCCA has to pay you regardless. Do you want to incur three times that amount in attorney fees instead?"

a reimbursement as recently as April 9, 2009.[7] The
MCCA's obligation to reimburse insurers—and the poten-
tial resulting benefits to plaintiffs' attorneys—is directly
at issue in these cases. Indeed, the MCCA asserts that it
has raised the amounts needed to pay expected claims and
its reserves by almost $694 million in anticipation of this
Court's likely reversal on rehearing of its prior deci-
sion, stemming from the participation of newly
elected Justice HATHAWAY in the decision after rehear-
ing. The MCCA further states that this increase is the
primary cause of the 19 percent increase in its assess-
ments for catastrophic coverage this year, which affects all
no-fault insurance policy holders' rates. The MCCA claims
that if, on rehearing, this Court prohibits the MCCA from
engaging in a "reasonableness" inquiry, see n 6 of this
statement, attorneys will reap the rewards at the expense
of Michigan drivers, whose insurance rates will rise to
support the resulting increased systemic costs.[8]

---

Insurer: "Of course not."

[7] MCR 2.003(B)(5) provides in part that a judge is disqualified from
hearing a case if "the judge's spouse . . . has an economic interest in the
subject matter in controversy . . . or has any other more than de minimis
interest that could be substantially affected by the proceeding." MCR
2.003(B)(6)(c) also provides that a judge is disqualified if the "judge or the
judge's spouse . . . is known by the judge to have a more than de minimis
interest that could be substantially affected by the proceeding[.]" Similarly,
the United States Supreme Court requires recusal with regard to a justice's
spouse if " 'the amount of the relative's compensation could be substantially
affected by the outcome' . . . ." See *Adair v Michigan*, 474 Mich 1027, 1031
(2006) (statement of TAYLOR, C.J., and MARKMAN, J.), quoting the United
States Supreme Court's Statement of Recusal Policy, November 1, 1993.

[8] No-fault automobile negligence cases remain a dominant factor in
Michigan civil filings every year. Of the 46,216 new civil filings in
Michigan circuit courts in 2008, 8,477—or more than one-fifth of all civil
cases—were automobile related. See 2008 Annual Report of the Michigan
Supreme Court, p 30 <http://www.courts.michigan.gov/scao/resources/
publications/statistics/2008/2008execsum.pdf> (accessed June 18, 2009).
Further, because many, if not most, no-fault claims settle out of court, the
number of claims potentially affected by this Court's ruling is much
higher than the number of cases filed.

THE *CAPERTON* DECISION

In *Caperton*, the United States Supreme Court "underscore[d] the need for objective rules" and asserted that the Due Process Clause requires recusal motions to be decided "by objective standards that do not require proof of actual bias." *Caperton*, 129 S Ct at 2263. In concluding that recently elected West Virginia Supreme Court of Appeals Justice Brent Benjamin was disqualified from hearing the underlying case as a result of substantial campaign expenditures by the chairman, CEO, and president of the respondent company, A. T. Massey Coal Co., Inc., the Court held that "[d]ue process requires an objective inquiry" to establish whether the circumstances " 'would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true.' " *Id.* at 2264, quoting *Tumey v Ohio*, 273 US 510, 532 (1927). Significantly, the Court thus considered the purported facts underlying the motion for recusal, see *Caperton*, 129 S Ct at 2264,[9] and concluded, on the basis of its assessment of those facts, that "there was . . . a serious, objective risk of actual bias," *id.* at 2265.

QUESTIONS RAISED BY *CAPERTON*

In light of the *Caperton* opinion, I do not think that we can resolve the MCCA's recusal motion—which squarely raises due process concerns—without first addressing the following questions:

• Does this Court's historical recusal practice—which permits each justice to decide motions for his or her recusal and which Justice Hathaway follows here—comport with the *Caperton* Court's requirement for objective standards? Justice Hathaway states: "[N]either I nor any member of my immediate family has any

---

[9] Somewhat confusingly, the Court considered the purported facts underlying the recusal motion, but also conceded that there was "no procedure for judicial factfinding . . . ." *Caperton*, 129 S Ct at 2264.

real or arguable financial interest in this case. The allegations made by the MCCA are not a basis for recusal because there is no appearance of impropriety and no due process violation." *Ante* at 47. She adds: "Given [the *Caperton*] test, I find no arguable due process violation in the cases before me. There is nothing alleged by the MCCA that would cause any reasonable person to believe that there is a significant and disproportionate influence being asserted upon me under any objective analysis." *Ante* at 46. But the challenged justice in *Caperton* issued similar statements in which he declined to recuse himself, explaining that the moving party had provided no objective evidence of actual bias and expressing his subjective opinion that none of his motives were improper. *Caperton*, 129 S Ct at 2262-2263. Indeed, West Virginia's recusal rules are strikingly similar to the practice followed by this Court. See *W Va Caperton*, *supra* at 702. Like Justice HATHAWAY—albeit while providing extensive factual detail concerning the allegations against him and legal precedent on the subject of recusal— Justice Benjamin asserted: "I have no pecuniary interest in the outcome of this matter. . . . I have no personal involvement with nor harbor any personal antipathy toward any party or counsel herein." *Id.* at 697. He added: "[N]o improper act or conduct, and no appearance of an improper act or conduct with respect to this case, or any other case, has occurred on my part[.]" *Id.* at 701. "Simply put, I do not have, nor was there any evidence to show that I had a 'direct, personal, substantial, pecuniary interest' in this case." *Id.* at 702. Yet the United States Supreme Court concluded that his subjective assertions that he lacked actual bias were insufficient for constitutional purposes. *Caperton*, 129 S Ct at 2263. Particularly in light of the similarities between Michigan's and West Virginia's recusal

practices—indeed, in both states recusal decisions have been left to the discretion of the individual justice whose recusal is sought, *W Va Caperton, supra* at 702—I simply cannot conclude without further study that the historic practice followed by Justice HATHAWAY today complies with *Caperton.* Nor can I conclude that Justice HATHAWAY may conclusively disavow any similarity to the facts of *Caperton* by simply offering her own opinion that "[t]here is nothing alleged by the MCCA that would cause any reasonable person to believe that there is a significant and disproportionate influence being asserted upon me under any objective analysis." *Ante* at 46.

• Is it sufficient under *Caperton* that four justices of this Court have voted to support Justice HATHAWAY's decision here? Although *Caperton* expressly failed to address a proper method for fact-finding, the Court reached its decision by carefully considering the facts surrounding Justice Benjamin's election. Here the MCCA alleges that Justice HATHAWAY must recuse herself because her husband has more than a *de minimis* financial interest in the subject matter of these cases. The MCCA points to very recent payments it has just made to one of Mr. Kingsley's clients. It also alleges that it has raised the amounts needed to pay expected claims and its reserves by $693.8 million in anticipation of this Court's potential reversal on rehearing of its earlier ruling in these cases; it states that the rate hike will be necessary because, if we reverse, claimants such as Mr. Kingsley's clients will receive substantially higher payments—*which result in higher attorney contingency fees*—because insurers will have no legal basis for resisting unreasonable settlement demands made by plaintiffs' attorneys. Can we possibly decide whether these alleged facts establish that " 'the probability of actual bias on the part of [Justice HATHAWAY] is too high to be constitutionally tolerable' " without first engaging in some kind of independent inquiry to test the claim

and Justice HATHAWAY's summary denial of it?[10] See
*Caperton*, 129 S Ct at 2257, quoting *Withrow v Larkin*,
421 US 35, 47 (1975).

I raise these concerns in part in light of the dissent filed
by Chief Justice Roberts in *Caperton*. He asks, among

---

[10] As former Chief Justice TAYLOR suggested to *Michigan Lawyers
Weekly*: " 'You can't set up the kind of test the U.S. Supreme Court
created in *Caperton* without giving parties the opportunity to have a
hearing . . . . Where else or how else will they be able to adduce the facts
needed to meet the new objective test?' " *MSC recusal rule may not be
constitutional*, Michigan Lawyers Weekly, June 15, 2009, p 23.

Moreover, as Justice YOUNG intimates, the narrow *Caperton* holding—
that, under some circumstances, an elected judge is disqualified from
hearing a case on the basis of contributions to his or her campaign—is also
directly implicated in this case and will continue to be regularly implicated
in cases before this Court given the current state of Michigan election law. As
it bears on this case, at her January 8, 2009, investiture ceremony, Justice
HATHAWAY attributed her election to various organizations that supported
her campaign. Investiture Ceremony for the Honorable DIANE M. HATHAWAY,
483 Mich cliii, clxviii (2009). Of particular note is her acknowledgment of the
Michigan Association for Justice (MAJ); the MAJ has explicitly supported
the defendants in these cases and filed an amicus curiae brief in support of
the motion for rehearing. Organizations that supported Justice HATHAWAY's
campaign, including the AFL-CIO, whose president, Mark Gaffney, acted as
master of ceremonies at the investiture proceeding, are also members of the
Coalition Protecting Auto No-Fault, which filed an amicus curiae brief in
these cases opposing Justice HATHAWAY's recusal. Further, these cases
involve insurance companies as parties. During her campaign, Justice
HATHAWAY regularly spoke out against insurance companies and suggested
that she would not " 'sid[e] with big insurance companies' " if she were
elected to this Court. *Hathaway sworn in as MSC's 104th justice*, Michigan
Lawyers Weekly, January 12, 2009, p 2. Upon her investiture as a justice of
this Court, she told the *Detroit News*: " 'For at least 10 years, the Michigan
Supreme Court has been in favor of insurance companies . . . . [Now] I think
we will see a lot more real justice out of this Supreme Court.' " *Michigan
Supreme Court to swear in newest justice*, Detroit News, January 8, 2009.
Under an objective *Caperton* inquiry, it seems inescapable that such com-
ments must be analyzed to establish whether the circumstances " 'offer a
possible temptation to the average . . . judge to . . . lead him not to hold the
balance nice, clear and true,' " *Caperton*, 129 S Ct at 2264, quoting *Tumey*,
*supra at 532*, or suggest "a serious, objective risk of actual bias," *Caperton*,
129 S Ct at 2265.

40 questions, whether—although a justice does not have an actual financial interest in the case—a litigant may challenge the justice's refusal to recuse himself or herself in federal district court under 42 USC 1983,[11]

Finally, I note the significant fact that *Caperton* provides no guidance concerning how to evaluate the effect of *anonymous* campaign expenditures, which are common in Michigan, as I discuss in n 1 of this statement. Indeed, anonymous and independent expenditures during the 2008 election season included $1.4 million garnered by the Democratic Party from undisclosed donors to underwrite a TV ad campaign impugning Justice Hathaway's opponent, former Chief Justice Taylor. *In Michigan courts, it's the public that's blindfolded,* Detroit Free Press, June 14, 2009. At this time, it is totally unclear how a court attempting to comply with *Caperton* would take such donations into account. As Justice Benjamin presaged in his *W Va Caperton* concurrence,

> every judicial officer in this state is subject to having to decide the merits of a case that involves a party or attorney who contributed to or supported, or, conversely, opposed his or her campaign for office. This now includes those who contribute to or support so-called Independent Expenditure Groups who engage in political campaigns completely independent of candidates of office.

*       *       *

> If the Appellees' argument became the law, every judicial officer in this state would be disqualified from any and every case in which an independent nonparty organization over which the judicial officer had no control received contributions from individuals or groups which included a person or entity affiliated with a party or an attorney in the case, when the independent nonparty organization used its contributions to wage a campaign against the judicial officer's electoral opponent. Conversely, such a standard would likely require a judge also to recuse himself or herself when an independent expenditure group operated against the judge or supported the judge's opponent. Our judicial system would break down under such a standard for disqualification. [*W Va Caperton, supra* at 699, 703-704.]

Clearly, without the benefit of further study and a process for objective fact-finding, this Court is ill-equipped to properly resolve the complex questions presented by *Caperton*.

[11] The summary nature of the majority's treatment of this disqualification motion indeed may lead the MCCA to test its due process claim in federal court under 42 USC 1983 rather than in this Court. This is yet another reason why we should allow the parties to brief the *Caperton* due process question.

which permits a person deprived of a federal right by a state official to sue for damages. *Caperton*, 129 S Ct at 2271 (Roberts, C.J., dissenting). He also reasonably asks whether the parties are "entitled to discovery with respect to the judge's recusal decision" and, "[i]f a judge erroneously fails to recuse, do we apply harmless-error review?" *Id.* at 2271-2272. As he suggests, the ramifications of *Caperton* are broad. This Court should seriously consider how to properly dispose of a "*Caperton* claim"[12] alleging that the probability of a justice's bias disqualifies that justice under the Due Process Clause.

I would thus invite thorough supplemental briefing on these significant issues before disposing of the MCCA's recusal motion. Because the majority has chosen to precipitously resolve this disqualification motion, I dissent.

YOUNG, J. Consistent with the Court's 170-year-old disqualification practice, I do not participate in the determination whether Justice HATHAWAY should disqualify herself. I join in Justice CORRIGAN's dissenting statement concerning the *Caperton*[1] question. I believe that this new United States Supreme Court opinion has radically altered the landscape of judicial disqualification and this change warrants that this Court *at least* entertain argument by the parties about how *Caperton* might affect the pending disqualification motion.

However, given Justice HATHAWAY's stated position on disqualification matters, I also write to raise questions about the casual way she has chosen to decide this motion and how her response may bear on the extraconstitutional disqualification proposals currently under consideration by this Court.

---

[12] See *Caperton*, 129 S Ct at 2274 (Scalia, J., dissenting).

[1] *Caperton v A T Massey Coal Co, Inc*, 556 US ___ ; 129 S Ct 2252; 173 L Ed 2d 1208 (2009).

Few issues have been the subject of more continual and contentious debate on this Court in the last decade than the appropriate standard that should apply in the disqualification of justices.[2] Justice HATHAWAY, who is now the subject of a disqualification motion in these cases, dismisses our efforts to comment on this issue as "inappropriate," "unnecessary," and a waste of taxpayer dollars. Such questions, however, are a traditional part of the debate and discussion inherent in the judicial process. It is, for example, why this Court holds oral arguments, and why it welcomes briefs, responses to briefs, and even replies to responses to briefs. By this process we educate ourselves and hopefully arrive at better decisions. Justice HATHAWAY either fails to appreciate the nature of the judicial process or simply seeks to avoid the hard questions about the inadequacies of her own extraordinarily limited response to the disqualification motion. *This is particularly evident because one of the central themes of Justice HATHAWAY's late Michigan Supreme Court campaign was her assertion that she subscribed to an "appearance of impropriety" disqualification standard and was, therefore, "more ethical" than the members of the previous philosophical majority*—former Chief Justice TAYLOR and Justices CORRIGAN and MARKMAN and I.[3]

---

[2] See, e.g., *Adair v Michigan*, 474 Mich 1027, 1038-1039 (2006) (statement of TAYLOR, C.J., and MARKMAN, J.); *Grievance Administrator v Fieger*, 476 Mich 231, 266-281 (2006) (opinion by TAYLOR, C.J., and CORRIGAN, YOUNG, and MARKMAN, JJ.); *Scalise v Boy Scouts of America*, 473 Mich 853 (2005); *In re JK*, 468 Mich 202, 219 (2003) (statement by WEAVER, J.); *Gilbert v DaimlerChrysler Corp*, 469 Mich 883 (2003), reconsideration denied 469 Mich 889 (2003). Justice WEAVER has also provided her own personalized history of this debate in her statement endorsing Justice HATHAWAY's continued participation in these cases.

[3] The following was part of Justice HATHAWAY's campaign: "Our Supreme Court is not being fair and impartial. . . . They are not recusing themselves and that is the problem; we need judges who are going to be

THE NATURE OF THE ALLEGATIONS AGAINST JUSTICE HATHAWAY

Defendant Michigan Catastrophic Claims Association (MCCA) has asserted that Justice HATHAWAY's husband is a no-fault plaintiffs' attorney who stands to profit in his no-fault practice if Justice HATHAWAY participates in these cases to overturn a decision made by this Court just months ago. The thrust of this claim is that a reversal of our earlier opinion will remove the legal basis, and thus the incentive, for insurance companies to resist unreasonable no-fault settlements demanded by claimants and their attorneys. Consequently, because insurance companies will be free to pass on these unreasonable settlements to the MCCA (which will eventually be paid for by the public, who must buy no-fault insurance), no-fault practitioners will increase their contingency fee yields by obtaining higher settlements than warranted.[4] A reversal will cost

fair and impartial in rendering their decisions and that is not happening." Interview with Lansing State Journal (October 17, 2008). She quipped that former Chief Justice TAYLOR was a "walking conflict of interest" because his wife had worked in the Governor's office. <http://www.youtube.com/watch?v=_7woWJDk1Qg> (accessed June 16, 2009). It was never alleged that former Chief Justice TAYLOR's wife stood to benefit financially from her husband's role on this Court, as defendant here suggests that Justice HATHAWAY's husband will. See *Adair, supra* at 1028 n 1. Finally, Justice HATHAWAY pledged to the people who elected her, "I have, and I will continue to disqualify myself *whenever there is the appearance of impropriety*," League of Women Voters of Michigan Voter Guide 2008 <http://www.lwvmi.org/documents/LWV08SupremeCourt.pdf> (accessed June 16, 2009) (emphasis added), and, "I have a habit of recusing myself if I think that there is even an appearance of impropriety," Interview with Lansing State Journal (October 17, 2008).

[4] The MCCA is a nonprofit association created by the Legislature to ensure that there are sufficient resources to fund benefits under our no-fault law for the catastrophically injured. See MCL 500.3104. Under our prior decision, the MCCA has authority to reject *unreasonable* claims when a member insurer's policy only provides coverage for "reasonable charges." *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 482 Mich 414, 417 (2008). The MCCA contends

purchasers of Michigan no-fault insurance an aggregate of $693.8 million more this year alone, accounting, in large part, for a more than 19 percent increase in the catastrophic claims premium every automobile no-fault insurance policy issued in this state will bear, which increase the MCCA's board of directors has already approved in anticipation of Justice HATHAWAY's critical vote to reverse the Court's prior decision. See the affidavit filed by the MCCA in Docket No. 133466, which is one of the documents referred to in n 2 of Justice HATHAWAY's statement.

Despite this, and without bothering to explain why, Justice HATHAWAY simply denies that she should be disqualified, adding that there is no appearance of impropriety in her participation. Justice HATHAWAY does not even deign to deny that her husband is a no-fault plaintiffs' practitioner or to assert that his practice will not benefit from her participation in a decision to overturn this Court's prior decision.

Justice HATHAWAY's refusal to live up to her own expressed standard of conduct is worthy of note in its own right: The people of this state deserve to know whether candidates promise one thing when running for office but deliver another when elected. But the far more important issue is the horror that would be visited on this Court if Justice HATHAWAY's preferred "appearance of impropriety" disqualification standard were actually adopted.

### HOW MAY A JUSTICE REBUT AN "APPEARANCE OF IMPROPRIETY"?

Justice HATHAWAY has provided *no* information in response to defendant's allegations of her family's fi-

---

that a reversal of the Court's decision will cause a dramatic increase in its exposure and the cost of insurance that it will pass along to the purchasers of no-fault insurance.

nancial interest in a reversal of the Court's prior decision; surely her terse and conclusory statement is not what the people envisioned when they elected a candidate vowing to adhere to a "higher" "appearance of impropriety" disqualification standard. *Ought not such a standard require that the target of the disqualification motion provide financial statements[5] or that an evidentiary hearing be conducted to determine the merit of the allegations of disqualification?*[6]

WHAT SUFFICES TO ESTABLISH AN<br>"APPEARANCE OF IMPROPRIETY"?

According to Justice HATHAWAY, allegations of a spouse's "economic interest in the subject matter in controversy" or "more than de minimis interest that could be substantially affected by the proceeding"—grounds requiring recusal under MCR 2.003(B)(5) and (6)(c)—are so irrelevant as to not even merit a discussion in her statement. *If these allegations of increased*

---

[5] During her campaign, Justice HATHAWAY affirmatively supported other financial disclosures: "I believe that there should be disclosure of all election campaign spending." Michigan Campaign Finance Network, Questionnaire for 2008 Michigan Supreme Court Candidates, p 1 <http://www.mcfn.org/pdfs/reports/SCquestionnaire.pdf> (accessed June 16, 2009). Indeed, several member organizations of the Coalition Protecting Auto No-Fault, which has filed an amicus curiae brief in these cases supporting Justice HATHAWAY's continued participation, supported Justice HATHAWAY's campaign. The Michigan Trial Lawyers Association and the United Automobile Workers each gave $34,000 to Justice HATHAWAY's campaign, the maximum allowed by law. During her campaign, Justice HATHAWAY stated that "a judge should consider[] disqualifying herself in any instance where a party has made a substantial campaign contribution." *Id.* In Justice HATHAWAY's calculus of disqualification ethics, do such contributions not raise "even the *mere appearance* of impropriety"? *Id.* at 2.

[6] And why, having promised a "higher standard of conduct" if elected, is it defensible for Justice HATHAWAY to shelter under the Court's historical disqualification practice that she disparaged on the campaign trail?

*family profit as a result of her participation in these cases do not establish an appearance of impropriety, what would?*[7]

### WHO WILL DETERMINE WHETHER THERE IS AN "APPEARANCE OF IMPROPRIETY"?

For the first time to my knowledge, members of the Court have participated in the merits of a disqualification decision on a motion addressed to another justice. Although Justices CAVANAGH and WEAVER and Chief Justice KELLY have joined *and endorsed* Justice HATHAWAY's decision, they have done so *solely* on the basis of Justice HATHAWAY's statement without any additional inquiry into the merits of her participation or the allegations raised. In this, their participation is merely a rote ratification of Justice HATHAWAY's cursory denial of the motion to disqualify.

The new majority's approval of and participation in the merits of the determination whether Justice HATHAWAY should be disqualified, while an alteration of our traditions, *is* consistent with several of the Court's pending disqualification proposals that require full Court participation or that of the Chief Justice.[8] With

---

[7] Moreover, do the fact that the motion for rehearing in these cases was prompted *solely* because of Justice HATHAWAY's replacement of Chief Justice TAYLOR and the fact that utterly no new substantive or legal arguments were raised in the motion, as generally required by MCR 2.119(F)(3), give rise to an appearance of impropriety with respect to her participation? See, e.g., *Peoples v Evening News Ass'n*, 51 Mich 11, 21 (1883), in which this Court opined that "a rehearing will not be ordered on the ground merely that a change of members of the bench has either taken place or is about to occur."

[8] It is unclear why Justice HATHAWAY and the new majority chose to adopt some aspects of the new proposals while claiming to adhere to our current disqualification practice. As stated, Justices CAVANAGH and WEAVER and Chief Justice KELLY have *never,* to my knowledge, publicly endorsed the decision of another justice targeted with a disqualification

out question, lodging such a determination with other justices of this Court will, at best, lead to gamesmanship to change the philosophical composition of the Court to alter the result in each such case. I ask: Would a 4-3 decision by the members of the Court favoring participation of a challenged justice cause the public to have greater or lesser faith that the targeted justice should ethically participate?

HOW WOULD SUCH A PROCEDURE BETTER SERVE THE PEOPLE OF THIS STATE THAN THE NEARLY 200-YEAR-OLD CURRENT DISQUALIFICATION PRACTICE?

These are but a *few* of the questions raised by Justice HATHAWAY's disposition of the pending motion to disqualify her. Given Justice HATHAWAY's campaign promises and our colleagues' published statements on disqualification over the years, not only the parties, but the public deserve more.

MARKMAN, J. Defendant has moved for Justice HATHAWAY's disqualification, arguing that "her spouse has an interest that could be substantially affected by the outcome of the proceedings." Justice HATHAWAY now denies this motion, concluding that she has "no personal bias or prejudice," that there is "no appearance of impropriety," and that there is "nothing alleged . . . that would cause any reasonable person to believe that there is a significant and disproportionate influence being asserted upon me," with little to no explanation. This decision must be viewed against a backdrop in which Justice HATHAWAY has been free in her criticism of other justices for their disqualification decisions. (For example, assert-

motion, as they have done here. However, because they considered nothing beyond Justice HATHAWAY's statement, it is hard to understand what their endorsement adds, other than being a statement of solidarity.

ing that the former Chief Justice of this Court was a "walking conflict of interest" because his wife worked for the Governor's office; stating that "our Supreme Court is not being fair and impartial . . . [;] they are not recusing themselves and that is the problem; we need judges who are going to be fair and impartial in rendering their decisions and that is not happening"; and proclaiming that, "I have, and I will continue to disqualify myself whenever there is the appearance of impropriety.")[1] Justice HATHAWAY has also supported this Court's decision to propose new procedures that would require disqualification whenever there is an "appearance of impropriety." ADM File No. 2009-4; see 483 Mich 1205 (2009). Finally, the United States Supreme Court's decision a few weeks ago in *Caperton v A T Massey Coal Co, Inc,* 556 US __ ; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), held that disqualification must now be determined on the basis of "objective standards." Given this backdrop, it is difficult to understand why Justice HATHAWAY believes that her conclusory response to defendant's motion is sufficient. Contrary to her justification for her unwillingness to explain her position ("I will not participate in this Court's practice of engaging in responses to comments of others that are inappropriate and unnecessary. This Court should discontinue devoting the state's limited resources to unproductive colloquy."), it is hardly to take the high ground for a justice to decline to address questions that have been raised by the parties and by other justices, and that are a direct outgrowth of that justice's own reform proposals, her own past criticisms of other justices, and a recent decision of the United States Supreme Court. Given that

---

[1] <http://www.youtube.com/watch?v=_7woWJDk1Qg> (accessed June 18, 2009); Interview with Lansing State Journal, October 17, 2008; and League of Woman Voters of Michigan Voter Guide 2008 <http://www.lwvmi.org/documents/LWV08SupremeCourt.pdf> (accessed June 18, 2009), respectively.

*Caperton* was decided just a few weeks ago, and in fairness to the parties, I would direct the filing of supplemental briefs. Among the questions I would direct the parties to address are whether all justices must now participate in deciding another justice's disqualification and whether the justice who is the object of disqualification may even participate. Absent such briefing, I am not yet prepared to deviate from this Court's practice of 172 years to the contrary. Therefore, I neither participate in nor address the merits of Justice HATHAWAY's decision not to grant defendant's motion.